ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JOSEPH N. AKROTIRIANAKIS (Cal. Bar No. 197971)
Assistant United States Attorney
Public Corruption & Civil Rights Section
  1300 United States Courthouse
  312 North Spring Street
  Los Angeles, California 90012
  Telephone: (213) 894-2467
  Facsimile: (213) 894-6436
  Email:      joseph.akrotirianakis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 10-_____ |
| | ) | |
| Plaintiff, | ) | <u>PLEA AGREEMENT FOR DEFENDANT</u> |
| | ) | <u>TRINA LEE KENNEY</u> |
| v. | ) | |
| | ) | |
| TRINA LEE KENNEY, | ) | |
| aka "Inga Whittman," | ) | |
| aka "Jackie Hayden," | ) | |
| aka "Sam Haydenburg," | ) | |
| aka "Patricia Jennings," | ) | |
| aka "Rachel Jennings," | ) | |
| aka "Ruth Jennings," | ) | |
| aka "Kate Kenney," | ) | |
| aka "Lisa Kenny," | ) | |
| aka "Sarah Lorenza," | ) | |
| aka "Sierra Randolph," | ) | |
| aka "Hattie Rush," | ) | |
| aka "Leslie Watson," | ) | |
| aka "Joni," | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

1.    This constitutes the plea agreement between TRINA LEE KENNEY, also known as ("a.k.a.") "Inga Whittman," a.k.a. "Jackie Hayden," a.k.a. "Sam Haydenburg," a.k.a. "Patricia Jennings," a.k.a. "Rachel Jennings," a.k.a. "Ruth Jennings," a.k.a. "Kate

Kenney," a.k.a. "Lisa Kenny," a.k.a. "Sarah Lorenza," a.k.a. "Sierra Randolph," a.k.a. "Hattie Rush," a.k.a. "Leslie Watson," a.k.a. "Joni" ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the investigation of defendant's Internet-based advertisements for the sale of horses, beginning in November 2004.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

a) Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a single-count information in the form attached to this plea agreement as Exhibit A or a substantially similar form.

b) Not contest facts agreed to in this agreement, including the Statement of Stipulated Factual Basis attached as Exhibit B.

c) Abide by all agreements regarding sentencing factors contained in this agreement.

d) Appear for all court appearances, surrender as ordered for the service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e) Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

2

f) Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

g) Pay the applicable special assessment at or before the time of sentencing, unless defendant lacks the ability to pay and submits a completed financial statement (form OBD-500) to the USAO prior to sentencing.

### THE USAO'S OBLIGATIONS

3.   The USAO agrees to:

a) Not contest facts agreed to in this agreement.

b) Abide by all agreements regarding sentencing factors contained in this agreement.

c) At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

d) Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not to prosecute defendant further for the violations of 18 U.S.C. §§ 1001, 1028A, 1341, and 1343 or other violations of federal criminal laws arising out of defendant's advertisement or sale of horses, over the Internet, during the period April 2005 through June 2008, as described in the Statement of Stipulated Factual Basis attached hereto as Exhibit B.  The scope of this non-prosecution agreement is coextensive with, and limited to those advertisements, sales, and transactions described in the

3

Statement of Stipulated Factual Basis attached hereto as Exhibit B, and defendant understands that the USAO is free to prosecute defendant for violations of federal criminal laws based on conduct not described in the Statement of Stipulated Factual Basis attached hereto as Exhibit B.  Defendant also understands that the USAO is free to prosecute defendant criminally for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.  Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

### NATURE OF THE OFFENSE

4.    Defendant understands that for defendant to be guilty of the crime charged in the information, a violation of Title 18, United States Code, Section 1341, the following must be true: (a) defendant made up or knowingly participated in a scheme or plan to defraud; (b) the scheme or plan related to a material matter; (c) the defendant acted with the intent to defraud; and (d) defendant used, or caused someone to use, the mails in advancing, or furthering, or carrying out this scheme to defraud.  Defendant admits that she is, in fact, guilty of this offense as described in the information.

### PENALTIES AND RESTITUTION

5.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18,

4

United States Code, Section 1341, is: 20 years imprisonment; a five-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

6.    Defendant understands that defendant will be required to pay full restitution to the victims of the offense.  Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the amount of restitution is not restricted to the amounts alleged in the count to which defendant is pleading guilty and may include losses arising from charges not prosecuted pursuant to this agreement as well as all relevant conduct in connection with those charges.  The parties currently believe that the applicable amount of restitution is approximately $250,000, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

7.    Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

8.    Defendant understands that, by pleading guilty,

5

defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

9. Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to removal, also known as deportation, which may, under some circumstances, be mandatory. The court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony conviction in this case. Defendant understands that by entering a guilty plea defendant waives any claim that unexpected immigration consequences may render defendant's guilty plea invalid.

FACTUAL BASIS

10. Defendant and the USAO agree to the Statement of Stipulated Factual Basis attached hereto as Exhibit B. Defendant and the USAO agree that this Statement of Stipulated Factual Basis is sufficient to support a plea of guilty to the charge

6

described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 12 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

SENTENCING FACTORS

11. Defendant understands that in determining defendant's sentence the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a)(1)-(7), including the kinds of sentence and sentencing range established under the Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

12. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | | |
|---|---|---|---|
| Base Offense Level | : | 7 | [U.S.S.G. § 2B1.1(a)(1)] |
| Specific Offense Characteristics: | | | |
| Loss > $200,000 | : | +12 | [U.S.S.G. § 2B1.1(b)(1)(F)] |
| ≥ 50 victims | : | + 4 | [U.S.S.G. § 2B1.1(b)(2)(B)] |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

13. Defendant understands that there is no agreement as to

7

defendant's criminal history or criminal history category.

14. Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

15. Defendant understands that by pleading guilty, she gives up the following rights:

a) The right to persist in a plea of not guilty.

b) The right to a speedy and public trial by jury.

c) The right to the assistance of an attorney at trial, including the right to have the Court appoint an attorney to represent defendant at trial. Defendant understands, however, that, despite defendant's guilty plea, defendant retains the right to be represented by an attorney -- and, if necessary, to have the Court appoint an attorney if defendant cannot afford one -- at every other stage of the proceeding.

d) The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e) The right to confront and cross-examine witnesses against defendant.

f) The right to testify on defendant's own behalf and present evidence in opposition to the charges, including calling witnesses and subpoenaing those witnesses to testify.

g) The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

8

h) Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

16. Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

17. Defendant agrees that, provided the Court imposes a sentence within the statutory maximum specified above, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence, and the manner in which any portion of the sentence was calculated; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, and the manner in which the fine was determined, provided the fine is within the statutory maximum; (d) the amount and terms of any restitution order imposed by the Court; (e) the term of any probation or supervised release imposed by the Court; and (f) any of the following conditions of probation or supervised release imposed by the Court: the standard conditions set forth in General Orders 318, 01-05, and/or 05-02 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7); and any condition of probation or supervised release requiring defendant not to use any name other than her

9

true name for any purpose.

18.    The USAO agrees that, provided all portions of the sentence are at or below the statutory maximum specified above, the USAO gives up its right to appeal any portion of the sentence.

RESULT OF WITHDRAWAL OF GUILTY PLEA

19.    Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

RESULT OF VACATUR, REVERSAL OR SET-ASIDE

20.    Defendant agrees that if the count of conviction is vacated, reversed, or set aside, or any enhancement imposed by the Court to which the parties stipulated in this agreement is vacated or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

10

EFFECTIVE DATE OF AGREEMENT

21.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

BREACH OF AGREEMENT

22.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered [a] guilty plea[s] pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

23.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then:

a) Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

11

b) Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c) Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

COURT AND PROBATION OFFICE NOT PARTIES

24. Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

25. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations are not error, although each party agrees

12

to maintain its view that the calculations in paragraph 12 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

26.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

## NO ADDITIONAL AGREEMENTS

27.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

## PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

28.  The parties agree that this agreement will be

13

considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED:

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF CALIFORNIA

ANDRÉ BIROTTE JR.
United States Attorney

_____     August 26, 2010
JOSEPH N. AKROTIRIANAKIS                    Date
Assistant United States Attorney

_____     8-20-10
TRINA LEE KENNEY                               Date
Defendant

_____     8/20/2010
JOSEPH SHEMARIA                               Date
Attorney for Defendant
TRINA LEE KENNEY

14

CERTIFICATION OF DEFENDANT

English is the language I understand best, and I speak English fluently. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney, Joseph Shemaria. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, including all of the rights I am giving up by entering into this plea agreement, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this plea agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge alleged in the attached information and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____          8·20·10
TRINA LEE KENNEY                          _____
Defendant                                  Date

15

## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am TRINA LEE KENNEY's attorney. I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of her rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____          _____ Aug 20, 2010
JOSEPH SHEMARIA                            Date
Attorney for Defendant
TRINA LEE KENNEY

16

# EXHIBIT  A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. CR 10-_____ |
| ) | |
| Plaintiff, ) | I N F O R M A T I O N |
| ) | |
| v. ) | [18 U.S.C. § 1341: Mail Fraud; |
| ) | 18 U.S.C. § 2(b): Causing an Act |
| TRINA LEE KENNEY, ) | to Be Done] |
| aka "Inga Whittman," ) | |
| aka "Jackie Hayden," ) | |
| aka "Sam Haydenburg," ) | |
| aka "Patricia Jennings," ) | |
| aka "Rachel Jennings," ) | |
| aka "Ruth Jennings," ) | |
| aka "Kate Kenney," ) | |
| aka "Lisa Kenny," ) | |
| aka "Sarah Lorenza," ) | |
| aka "Sierra Randolph," ) | |
| aka "Hattie Rush," ) | |
| aka "Leslie Watson," ) | |
| aka "Joni," ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

The United States Attorney charges:

[18 U.S.C. §§ 1341, 2(b)]

A.    INTRODUCTION

1.    At all times relevant to this information, defendant TRINA LEE KENNEY, also known as ("aka") "Inga Whittman," aka "Jackie Hayden," aka "Sam Haydenburg," aka "Patricia Jennings,"

aka "Rachel Jennings," aka "Ruth Jennings," aka "Kate Kenney," aka "Lisa Kenny," aka "Sarah Lorenza," aka "Sierra Randolph," aka "Hattie Rush," aka "Leslie Watson," aka "Joni" ("TRINA LEE KENNEY"), was a resident of San Bernardino and Riverside Counties, and operated several businesses, including Prestige Distribution LLC, Horses and Ponies, and Star Horses, within the Central District of California.

B.    THE SCHEME TO DEFRAUD

2.    Beginning on a date unknown, but no later than in or about November 2004, and continuing through at least in or about June 2008, in San Bernardino County, within the Central District of California, and elsewhere, defendant TRINA LEE KENNEY and an uncharged co-schemer, together with others known and unknown to the United States Attorney, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud at least 61 prospective horse purchasers (collectively, the "victims"), as to material matters, and to obtain money and property from the victims by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

3.    The fraudulent scheme operated, in substance, in the following manner:

a.    Defendant TRINA LEE KENNEY would place advertisements for the sales of horses on Internet-based websites, such as Dreamhorse.com, Eqine.com, Equinenow.com, Horsetopia.com and AgDirect.com, that featured such advertisements.  In advertisements she placed, defendant TRINA LEE KENNEY would represent, among other things, that the horses

2

she was offering for sale were of specific breeds and pedigrees, had specific physical characteristics, abilities, and temperaments, and were registered with a national or international organization that certified and/or documented the pedigrees of various breeds of horses. Defendant TRINA LEE KENNEY would also make specific representations concerning the health of the horses she advertised for sale and represented that horse purchasers would be protected by a guarantee of satisfaction.

b.     In response to expressions of interest in the purchase of horses described in her advertisements, defendant TRINA LEE KENNEY would make further representations about the temperaments of the horses she was offering for sale. In addition, defendant TRINA LEE KENNEY would, for the purpose of encouraging faster sales of the horses she advertised, falsely represent that others were interested in purchasing a particular horse, or that a particular horse was being sold at a discount because it needed to be sold quickly.

c.     When a prospective horse purchaser would agree to purchase a horse, defendant TRINA LEE KENNEY would instruct the prospective horse purchaser to send, through the mails or by wire transfer, one or more payments for the purchase of an advertised horse. Such monies were deposited into personal or business bank accounts controlled by defendant TRINA LEE KENNEY and the uncharged co-schemer, including bank accounts held for the benefit of E.K. and J.K., defendant TRINA LEE KENNEY's minor children.

d.     After receiving partial or complete payment for

3

the purchase of a horse, defendant TRINA LEE KENNEY and the uncharged co-schemer would provide the victim with a horse completely and materially different from the particular horse the victim had agreed to purchase, or would not provide a horse at all.  In those circumstances where "misrepresented" horses were provided to victims, the horses had often been abused, neglected, or were in conditions of ill health, and/or carrying highly contagious -- and potentially fatal -- equine diseases, such as strangles.

e.    After several victims had been defrauded, certain victims began discussing defendant TRINA LEE KENNEY's fraudulent scheme on Internet "bulletin boards" and in Internet "chat rooms."  Thereafter, defendant TRINA LEE KENNEY began using aliases, such as "Inga Whittman," "Jackie Hayden," "Sam Haydenburg," "Patricia Jennings," "Rachel Jennings," "Ruth Jennings," "Kate Kenney," "Lisa Kenny," "Sarah Lorenza," "Sierra Randolph," "Hattie Rush," "Leslie Watson," and "Joni," among others, for the purpose of concealing her true identity, and to continue the fraudulent scheme to defraud additional victims.

f.    As a result of the above-described fraudulent scheme, defendant TRINA LEE KENNEY and the uncharged co-schemer fraudulently obtained more than $200,000 from the victims. Defendant TRINA LEE KENNEY and the uncharged co-schemer subsequently spent these fraudulently-obtained monies to purchase, among other things, vehicles, vacations, furniture, and other items for their personal use and enjoyment.

C.    <u>THE USE OF THE MAILS</u>

4.    On or about July 23, 2007, in San Bernardino County,

4

within the Central District of California, and elsewhere, defendant TRINA LEE KENNEY, for the purpose of executing the above-described scheme to defraud, willfully caused United States Postal Service money orders bearing numbers 11254327255, 11254327266, 11254327277, made payable to Prestige Distribution, in the amounts of $1000, $1000, and $500, respectively, to be placed in an authorized depository for mail matter to be sent and delivered by the United States Postal Service, according to the directions thereon, to wit: 31805 Highway 79, Temecula, California 92592, a private mailbox leased by the uncharged co-schemer.

ANDRÉ BIROTTE JR.
United States Attorney


ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section

ALKA SAGAR
Assistant United States Attorney
Deputy Chief, Major Frauds Section

JOSEPH N. AKROTIRIANAKIS
Assistant United States Attorney
Public Corruption & Civil Rights Section

# EXHIBIT B

STATEMENT OF STIPULATED FACTUAL BASIS

During the period November 2004 through June 2008, defendant Trina Kenney, with the intent to defraud, devised and, together with her husband, executed a scheme to defraud at least 61 prospective horse purchasers (collectively "victims"), as to material matters, and to obtain money and property from the victims by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

To execute the scheme, defendant would place advertisements for the sales of horses on Internet websites such as dreamhorse.com, eqine.com, equinenow.com, horsetopia.com and agdirect.com, that featured such advertisements.  In her advertisements, defendant represented that the horses she was offering for sale had specific physical characteristics, abilities, and temperaments, were of specific breeds and pedigrees, and were registered with national or international organizations that certified and/or documented the pedigrees of various breeds of horses.  Defendant also made representations concerning the health of the horses she advertised for sale and represented that horse purchasers would be protected by a "money back" satisfaction guarantee.

In response to expressions of interest in the purchase of horses described in her advertisements, defendant would, for the

1

purpose of encouraging faster sales of the horses she advertised, falsely represent that others were interested in purchasing a particular horse, or that a particular horse was being sold at a discount because it needed to be sold quickly.

Defendant would instruct prospective horse purchasers who agreed to purchase horses to send one or more payments for the purchase of an advertised horse.  Such monies were deposited into personal or business bank accounts controlled by defendant and her husband, including bank accounts held for the benefit of E.K. and J.K., defendant's minor children.

After receiving payment(s) for a horse purchase, defendant and Richard Ray Kenney would either (a) not provide a horse or a refund of the monies received from the victims; or (b) provide a horse completely and materially different from the horse the victim had agreed to purchase.  Thereafter, defendant would not answer or return phone calls or electronic mail ("email") from victims and would falsely claim that the victims had breached the sale contract and would threaten to sue the victims for breach of contract or for defaming defendant.

This Statement of Stipulated Factual Basis incorporates by reference, as though fully set forth herein, Attachment 1, listing descriptions of several of defendant's transactions with victims to whom defendant provided horses completely and materially different from the horses the victims had agreed to

2

purchase and Attachment 2, listing the victims who either never received a horse or returned a misrepresented horse for exchange and were never provided the exchange or a refund.

After defendant became aware that her victims had posted complaints about defendant's fraudulent scheme on Internet "bulletin boards" and in Internet "chat rooms" related to owning, keeping, and caring for horses, defendant began using aliases, including "Inga Whittman," "Jackie Hayden," "Sam Haydenburg," "Patricia Jennings," "Rachel Jennings," "Ruth Jennings,""Kate Kenney," "Lisa Kenny," "Sarah Lorenza," "Sierra Randolph," "Hattie Rush," "Leslie Watson," and "Joni, for the purpose of concealing her true identity, so that she could continue the fraudulent scheme and defraud additional victims.

Prior to May 8, 2007, defendant, using the alias "Sierra Randolph," posted advertisement no. 993583 on dreamhorse.com. The advertisement offered for sale a registered Friesian mare, "Azure" for $5,000.  In the advertisement, defendant represented:

> Azure is a beautiful, registered, 2nd. premie, friesian [sic] mare.  She is a great trail horse and is wonderful in the arena.  Azure has beautiful feathering on her legs.  She is the center of attention wherever she goes.  I have shown her and trained her.  She has been bred twice and is a very easy breeder.  Nothing is spooky to her.  She is bold and brave and very

3

experienced.  All her shots are up to date and her worming.  I am also willing to ship her.  I am leaving out of state, so I have to sell her.

In reality, defendant did not own "Azure" (or any other Friesian) at the time she posted the advertisement or at any other relevant time, and defendant had no intent of acquiring or selling "Azure" or any other Friesian.  Rather, defendant had fabricated "Azure" completely and then posted advertisement no. 993583 with the intent to defraud a would-be purchaser.

After receiving complaints from several of the victims named in Attachments 1 and 2, on May 8, 2007, a Federal Bureau of Investigation Special Agent and a United States Postal Inspector, acting in an undercover capacity in the persona of "Becky Walters," contacted defendant through advertisement no. 993583 and expressed interest in purchasing "Azure."

On May 10, 2007, defendant, using the alias "Joni," replied to "Becky Walters" by email, using email account sierramountains818@yahoo.com, and sent pictures of a Friesian mare.  In her email, defendant provided 31805 Hwy 79, Temecula, California 92592 as an address to which "Becky Walters" could send a $2500 deposit for the purchase of "Azure."  Defendant also provided a contact telephone number.

On July 11, 2007, "Becky Walters" emailed defendant at sierramountains818@yahoo.com and inquired whether "Azure" was

4

still available for purchase.  On July 14, 2007, defendant, in her alias "Joni," replied by email that "Azure" was still available, even though defendant had already received $5000 as payment for "Azure" from victim Julianne Carpenter on May 9 and May 18, 2007.  "Becky Walters" agreed to send defendant a $2500 deposit for the purchase of Azure.

On July 19, 2007, "Becky Walters" emailed defendant at sierramountains818@yahoo.com and requested that defendant provide a contract for the sale of "Azure."

On July 23, 2007, "Becky Walters" deposited in the United States mail a United States Postal Service Express Mail package bearing tracking number ED050886849 and containing three United States Postal Service money orders bearing numbers 11254327255, 11254327266, 11254327277 and made payable to Prestige Distribution, in the amounts of $1000, $1000, and $500, respectively.  The package was addressed Prestige Distribution, 31805 Highway 79, Temecula, California 92592, a private mail box leased by defendant's husband and located in a UPS Store.  On July 24, 2007, the package arrived at the UPS Store.

On August 1, 2007, defendant, in the alias "Joni," emailed "Becky Walters" and falsely stated that she had been having "problems with her gallbladder and it looks like I need to have it removed."  At the time, defendant and her husband were, in fact, vacationing in Las Vegas, Nevada.

On August 22, 2007, defendant, using the alias "Joni," emailed "Becky Walters" and falsely stated that she had been bedridden and unable to check her email.  Defendant provided "Becky Walters" with a new contact telephone number, (714) 336-5766, and the number of a Washington Mutual bank account ("Prestige Distribution Washington Mutual business bank account") to which "Becky Walters" was to wire the remaining $2500 for the purchase of "Azure."

On August 23, 2007, defendant, using the alias "Joni," emailed "Becky Walters" a contract for the purchase of "Azure." The contract guaranteed the horse's "soundness and health . . . for 30 days," and provided a "full refund" guarantee if the horse was "found to be unsound, or unfit."

On August 23, 2007, "Becky Walters" attempted to contact defendant at a number defendant previously provided, but the person who answered hung up when "Becky Walters" asked to speak with "Joni."  On the same day, defendant's husband called the UPS Store located at 31805 Hwy 79, Temecula, California, and requested that all mail collected in the mailbox be forwarded to a UPS Store in Las Vegas, Nevada.

On August 24, 2007, federal agents observed and photographed defendant's husband taking delivery of the forwarded mail, including the United States Postal Service Express Mail package bearing tracking number ED050886849 and containing the three

6

United States Postal Service money orders bearing numbers 11254327255, 11254327266, 11254327277, at the Las Vegas UPS Store. Defendant's husband then left the UPS Store and entered a pickup truck being driven by defendant. Later the same day, defendant, using the alias "Joni," left a voicemail message for "Becky Walters." In the message, defendant confirmed her receipt of the money orders, requested that the remaining $2500 be paid as quickly as possible, and stated that "Azure" was in the Temecula area, but provided no specified address.

On August 25, 2007, defendant, using the alias "Joni," again emailed "Becky Walters." In her message, defendant asked why the remaining $2500 had not yet been wired into her account. Later that day, "Becky Walters" called defendant at telephone number (714) 336-5766 and left a voicemail message indicating her son would pick up "Azure" on Wednesday (August 29, 2007) and requested the address where delivery of the horse could be taken.

Later the same day, defendant, using the alias "Joni," sent an email to "Becky Walters" asking again whether the wire transfer of the outstanding $2500 had been completed. Defendant wrote that a "friend" would be "there" to help load "Azure" into a trailer. Again, defendant specified no address where delivery of "Azure" could be taken.

On August 27, 2007, defendant's husband negotiated United States Postal Service money orders nos. 11254327255, 11254327266,

7

11254327277 and deposited the $2500 into the Prestige Distribution Washington Mutual business bank account.  The same day, "Becky Walters" deposited $2500 into the Prestige Distribution Washington Mutual business bank account, as defendant had requested.

Also on August 27, 2007, "Becky Walters" also emailed sierramountains818@yahoo.com and stated that her son would pick up "Azure" between 10:00 and 10:30 a.m. on August 29, 2007, and again requested the specific address where delivery of the horse could be taken.  Defendant did not respond to this or any other subsequent email from "Becky Walters," despite many entreaties that she do so.  Defendant did not answer telephone calls made to (714) 336-5766 on August 28, 29, or 31, 2007, and September 5, 10, 17, 2007 or respond to voicemail messages left at that number on those dates.

At all times relevant to the foregoing interactions with "Becky Walters," defendant acted with the intent to defraud.

8

# Attachment 1

ATTACHMENT 1

The following victims paid defendant the amounts indicated on or about the dates indicated. Each of the following victims received a horse materially different from that defendant advertised and agreed to provide. None of the following victims ever received back any of the money they paid defendant, except as noted. With respect to her contacts with the following victims, defendant acted with the intent to defraud.

| Name (Location) | Date | Amount | Description |
|---|---|---|---|
| 1. Jimenez, Sylvia (CA) | 11/19/2004 | $1800 | Horse defendant advertised as a Paint horse for beginners was wild and unridable, had never been broken, and had only been used for breeding. Defendant had drugged the horse to make it appear docile during victim's initial examination. The victim returned the horse but defendant refused to refund the purchase price. (The remains of horse were later found in the snow on defendant's property.) |
| 2. Packer, Kim (CA) | 11/19/2005 | $1250 | Horse defendant advertised on recycler.com as healthy and "bombproof" (i.e., suitable for a beginner rider because it would not upset or scare at any strange sights or noises and would be forgivable of a beginner's mistakes) was lame in the rear legs and had a nasal discharge. |
| 3. Heidker, J. (NV) | 11/29/2005, 12/08/2005 | $1100 | Horses provided to victim were not the healthy and "kid safe" pony and black bay mare defendant advertised on equine.com. Pony was wild and unridable. Black bay mare was barely able to stand and was bleeding from reproductive parts. (Black bay mare diagnosed with a broken pelvis and euthanized, along with three other horses found on defendant's property that day.) Defendant returned $1000 to victim |

1

| | | | |
|---|---|---|---|
| | | | for the black bay mare. |
| 4. Bolton, K. (CA) | 12/13/2005 | $1000 | Horse defendant advertised on equine.com as a healthy Palomino mare was approximately 300 pounds underweight and had strangles and open sores. Defendant refused to answer or return calls from victim seeking to return horse pursuant to "satisfaction guarantee." |
| 5. Bradley, D. (LA) | 12/30/2005, 01/13/2006 | $5100 | Horse defendant advertised on horsequest.com as having extensive trail and dressage training and suitable for beginner riders was not trained and did not have the temperament for a beginner rider. Horse also had no registration papers, no health certificate, and no interstate transportation certificate. Defendant refused to respond to any attempts to contact her about the "30-day guarantee" promised. |
| 6. Robinson, D. (CA) | 12/31/2005 | $1000 | Horse defendant advertised over the Internet as a "bombproof" ten-year old Quarter Horse and a "great family horse" that "anyone can ride" and retired from a Girl Scouts camp was a former racehorse in the mid-twenties that could not even be saddled and had to be euthanized because it had gastrointestinal problems so severe it was no longer able to eat. |
| 7. Kalayjian, J. (CA) | 01/03/2006 | $1400 | Horse defendant advertised on equine.com as "bombproof" and safe for a child to ride was wild and not halter broken, as well as being lame. Defendant also misrepresented that her minor child had been riding the horse for a year when, in fact, defendant had purchased the horse for $400 less than a month earlier at an auction in Bakersfield, California. |
| 8. Bond, S. (CA) | 02/27/2006 | $3700 | Horse defendant advertised on equine.com as a calm and gentle horse "perfect for timid and beginner" riders was wild and high- |

|   |   |   |   |
|---|---|---|---|
|   |   |   | tempered.  (A horse trainer hired by victim was thrown from the horse.)  Defendant would not return any calls about 30-day guarantee until 30 days had expired, and then claimed it was too late to return the horse.  Horse also had a gash on the head. |
| 9. Banks, J. (TN) | 03/10/2006 | $5500 | Horse defendant advertised on equine.com as healthy Dutch Warmblood was approximately 200 pounds underweight, had lameness in three legs, was unshod and had overgrown hooves.  The horse was also wild and could not be ridden and threw a horse trainer hired by victim.  The horse was not a Dutch Warmblood, but a Thoroughbred that was a retired racehorse. |
| 10. Stern, C. (CA) | 03/21/2006 | $4850 | Two horses defendant advertised as "bombproof" horses that could jump were an unbroken grey mare and a lame sorrel horse, neither of which could be ridden. |
| 11. Poirier, D. (TX) | 03/23/2006 | $1500 | Horse defendant had advertised for sale on equine.com as "bombproof," healthy, and very calm Paint horse, "super for any level of rider," and current on shots, de-worming, and shoeing had a hernia, a parrot mouth and could not be ridden.  The horse was also provided with hooves approximately eight inches too long in the rear, and a deformed left hind leg. Defendant also never sent any of the paperwork or shots and refused to honor "money back" guarantee. |
| 12. Furrer, M. (CA) | 03/26/2006 | $1350 | Horse defendant advertised on yahoo.com as healthy was lame in three legs and unable to be ridden.  The horse also had a green discharge from the nose and a severe cough. Defendant refused to honor a promised 14-day guarantee. |
| 13. Purdin, L. (AZ) | 05/04/2006 | $1500 | Horse defendant advertised on equine.com as "bombproof" and trained in Western and English riding was untrained and |

3

| | | | approximately ten years older than advertised. |
|---|---|---|---|
| 14. White, J. (CA) | 05/17/2006 | $2000 | Horse defendant advertised on equine.com as sound and healthy and without physical or temperament problems was severely underweight, pigeon-toed, bow-legged, and had been beaten. |
| 15. Arabia, P. (CA) | 06/15/2006 | $1000 | Horse defendant advertised on horsetopia.com as an eight-year old Palomino mare that was a "great beginner horse" was wild and unridable, as well as being covered in sores. |
| 16. Saadatmanesh, H. (AZ) | 07/19/2006 | $4000 | Horse defendant advertised as a Dutch Warmblood, "Hampton," on agdirect.com as "completely sound and healthy" was seriously underweight, not the advertised height, not a Dutch Warmblood, and did not have any registration papers. |
| 17. Robinson, J. (WA) | 07/20/2006 | $4500 | Horse defendant advertised as a Dutch Warmblood, "Hampton," on agdirect.com as "completely sound and healthy" had a club foot, cuts all over the body, was 200 to 300 pounds underweight, was not a Dutch Warmblood, and had no registration papers. |
| 18. Barron, J. (CA) | 08/21/2006 | $4000 | Horse defendant advertised as a Dutch Warmblood, "Hampton," on agdirect.com as "completely sound and healthy" was underweight and lame and was not a Dutch Warmblood.  The horse was also approximately ten years older than advertised.  (On July 31, 2006, Patti Donais, of Minnesota, also paid defendant $3000 for the same horse, in response to the same advertisement.) |
| 19. Miladinovich, M. (WY) | 08/25/2006 | $3053 | Two horses defendant advertised as registered, healthy, and sound were so underweight that ribs were visible and had hooves that had been untrimmed so long that the horses could not walk.  One of the |

4

|  |  |  | two horses had a respiratory infection. Defendant would not answer or return any calls and later threatened to sue victim for defamation when defendant was contacted by victim's friend. |
|---|---|---|---|
| 20. Cuddy, D. (MI) | 09/05/2006 | $5500 | Horse defendant advertised on agdirect.com as a Dutch Warmblood mare was a Thoroughbred that was a retired racehorse. |
| 21. de Fontaine, A. (CA) | 09/18/2006 | $5000 | Horse defendant advertised on dreamhorse.com as a registered Dutch Warmblood, 17.1 hands high, healthy and sound was a Thoroughbred, 15.3 hands high, emaciated, unsound on the back legs, and limping, with ringworm and open sores on its face. Defendant provided no registration papers. |
| 22. Horsman, S. and Bistline, M. (AZ) | 10/02/2006 | $1700 | Horse defendant advertised on horsetopia.com as a ten-year old registered American Quarter Horse mare that was family friendly, broke, healthy, sound, appropriate for children to ride, and not yet bred was approximately sixteen years old and unable to breed due to permanent reproductive damage caused by an untreated infection which resulted from an injury suffered during past foaling that was never surgically repaired. (Horse's former owner stated that horse had never been broken and had been strictly used as a broodmare.) Papers defendant provided were for an American Paint Horse, not an American Quarter Horse. |
| 23. Schirmer, R. (CO) | 11/14/2006 | $9650 | Two horses defendant advertised on dreamhorse.com as registered Dutch Warmblood mares with a satisfaction guarantee were not registered, were not Warmbloods, and were lame, underweight, and covered in scabs and scars. Defendant had also misrepresented the horses' age, height, and training. |

| 24. Lawson, P. (CA) | 11/06/2006, 11/17/2006, 11/25/2006, 12/01/2006, 12/13/2006 | $3625 | Horse defendant advertised for sale on equine.com as a trained Danish Warmblood was an Arabian mixed with a Quarter Horse that was never trained or even broken. |
| 25. Reynolds, J. (WV) | 12/28/2006, 01/09/2007 | $4269 | Horse defendant advertised over the Internet as a registered, seven-year old Friesian mare (all Freesias are black in color) was an approximately sixteen-year old brown horse that had been dyed black. Defendant, who used the alias "Inga Whittman" throughout the transaction, did not provide breeding papers or an interstate transportation certificate and provided an expired Utah health certificate for a two-year old Quarter Horse that defendant's husband had purchased at an auction in Bakersfield, California. |
| 26. Winfield, L. (OH) | 01/31/2007 | $5000 | Horse defendant advertised on dreamhorse.com as a Friesian was a bay (brown with black tail and mane) Quarter Horse that had been dyed black. Horse was also pregnant and foaled shortly after victim received it, requiring victim to pay for the boarding of two horses rather than one. |
| 27. Clark, H. (VA) | 02/08/2007, 03/22/2007, 04/03/2007 04/13/2007 | $16,5000 | Three horses defendant had advertised as "registered with the Gypsy Cob Society UK," having "been ridden and handled by children," "safe and sane horses," "gentle and great for someone who may be timid around horses," and descendant of particular Gypsy horses were not Gypsy Cobs, were malnourished, had overgrown hooves, were so skittish that the hauler the victim hired was unable to handle them, and destroyed a barn recently built on the victim's property. Defendant, who used the alias "Pat" throughout the transaction, also did not provide promised health certificates and interstate transportation certificates, and threatened to sue the victim if defendant |

6

was not paid an additional $3325 for the boarding of the horses between the date of the contract and the delivery of the horses to the hauler. Defendant also threatened to report victim to the police for having stolen horses from defendant.

# Attachment 2

ATTACHMENT 2

The following victims paid defendant the amounts indicated on or about the dates indicated.  Each of the following victims either never received a horse or returned a misrepresented horse for refund of the purchase price or exchange and were never provided the refund exchange.  None of these victims ever received back any of the money they paid defendant.  With respect to her contacts with the following victims, defendant acted with the intent to defraud.

| No. | Name | Location | Amount | Date |
|-----|------|----------|--------|------|
| 1. | Babb-Murphy, Mary | Wisconsin | $1500 | 03/30/2006 |
| 2. | Babnick, Meridith Mae | Florida | $5500 | 12/21/2006 |
| 3. | Baine-Knibb, Deborah | California | $5000 | 08/30/2006 |
| 4. | Berson, Anne deMille | Maryland | $3875 | 01/23/2006 |
| 5. | Burk, Wendy | Kentucky | $5350* | 06/01/2008 |
| 6. | Burkheimer, Kendra | California | $1710 | 05/29/2007 |
| 7. | Carnick, Judith Carol | Colorado | $3500 | 01/19/2006 |
| 8. | Carpenter, Julianne | Oregon | $5000 | 05/10/2007, 05/18/2007 |
| 9. | Christensen, S. | Oregon | $5000 | 12/28/2006 |
| 10. | Davies, Susan | California | $3500 | 02/26/2007 |
| 11. | Donais, Patricia Ann | Minnesota | $3000 | 07/31/2006 |
| 12. | Dove, Autumn | California | $2500 | 10/01/2007 |
| 13. | Girard-Iadanza, S. | Arizona | $2000 | 04/22/2005 |
| 14. | Haynes, Julie | California | $4500 | 11/17/2006 |
| 15. | Holmes, Ellen | Oklahoma | $5800 | 03/21/2007 |
| 16. | Hurlburt, Deeann | Canada | $2750 | 08/29/2007 |
| 17. | Krankowski, Nicole | California | $3000 | 04/01/2006 |
| 18. | Lanier, Sharon | Oregon | $1500 | 05/01/2008 |
| 19. | Lorincz, Susan | Florida | $2575 | 02/26/2007 |
| 20. | Maddox, Lynn | Kansas | $4500 | 06/17/2008 |
| 21. | Mathews Kimberly | Canada | $  75 | 05/03/2007 |
| 22. | McClendon, Cynthia | California | $5000 | 01/08/2007 |
| 23. | Nelson, Winnie | Washington | $6500 | 02/02/2007 |
| 24. | O'Leary, Shawn | Wisconsin | $2000 | 03/30/2006 |
| 25. | Rash-Williams, Cathy | Montana | $1300 | 02/24/2006 |
| 26. | Reilly, Merlayne | Canada | $5500 | 02/22/2008 |
| 27. | Rodriguez, Chelsae | California | $ 900 | 11/01/2005 |

1

| | | | | |
|---|---|---|---|---|
| 28. | Schweighart, Monica | New Jersey | $7000 | 04/05/2006, 04/11/2006 |
| 29. | Spicher, Alta-Nellie | Oregon | $5000 | 06/18/2007 |
| 30. | Talbott, Alcina | California | $1800 | 02/02/2006, 04/05/2006 |
| 31. | Warren, Ron | California | $1850 | 07/20/2005 |
| 32. | Wentzel, Diane Lynn | Ohio | $5500 | 10/25/2007 |
| 33. | Wells-Hess, Gail | Oregon | $ 500 | 10/26/2006 |
| 34. | Wortman, Cindy | Arizona | $5500 | 04/17/2008 |

*     Ms. Burk received $5350 back from defendant.

2