ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JOSEPH N. AKROTIRIANAKIS (Cal. Bar No. 197971)
Assistant United States Attorney
Public Corruption & Civil Rights Section
   1300 United States Courthouse
   312 North Spring Street
   Los Angeles, California 90012
   Telephone: (213) 894-2467
   Facsimile: (213) 894-6436
   Email:      joseph.akrotirianakis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

               FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,         ) No. CR 10-969-AHM
                                  )
                 Plaintiff,       ) GOVERNMENT'S SENTENCING
                                  ) MEMORANDUM AS TO DEFENDANT
            v.                    ) TRINA LEE KENNEY
                                  )
TRINA LEE KENNEY,                 ) Sentencing Date: March 24, 2011
                                  ) Sentencing Time: 3:00 p.m.
                 Defendant.       )
                                  )

     Plaintiff United States of America, by and through its

counsel of record, the United States Attorney for the Central

District of California and Assistant United States Attorney

Joseph N. Akrotirianakis, hereby files its Sentencing Memorandum

as to defendant Trina Lee Kenney ("defendant") and requests that

//

//

//

//

//

//

the Court impose the sentence recommended by the United States Probation Office.

DATED: March 2, 2011          Respectfully submitted,

                              ANDRÉ BIROTTE JR.
                              United States Attorney

                              ROBERT E. DUGDALE
                              Assistant United States Attorney
                              Chief, Criminal Division

                              *Joseph N. Akrotirianakis*
                              JOSEPH N. AKROTIRIANAKIS
                              Assistant United States Attorney
                              Public Corruption & Civil Rights Section

                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

2

GOVERNMENT'S SENTENCING MEMORANDUM

1.   Objections to Presentence Report

On December 27, 2010, the United States Probation Office ("USPO") disclosed its Presentence Report ("PSR") and Sentencing Recommendation Letter in this matter.  The government has reviewed the PSR and has no objections to the USPO's factual findings or Sentencing Guidelines calculations.

The government has the following comments about page 4 of the Recommendation Letter (factors "in mitigation").  The government does not dispute that, in some cases, certain of defendant's assertions, as recounted in paragraphs 58-60 of the PSR, could be mitigating factors that justify a Booker departure.[1]  Such facts about abuse, even if accepted as true, can only go so far in mitigating a criminal history that makes clear that defendant has been involved in several fraud schemes over the course of several years.

The government also has no effective way to test defendant's assertions that she was abused as a child.  The government has consulted with the USPO, however, and has learned that the statements in the PSR about physical and verbal abuse, as well as the allegations of sexual abuse, are all based exclusively on defendant's self-reporting.  The government points out that defendant is a felon who now has four convictions for fraud or

---

[1]   The government does not agree that being raised in a strict, religious household by controlling parents is a "mitigating factor."  Many, many people are raised in the same circumstances.  Others who are not complain that the absence of either is a "mitigating factor."  The claimed circumstances of defendant's upbringing do not provide a reason for a Booker departure.

1

theft (by fraud) or other conduct involving dishonesty and therefore probative of a untruthfulness, and that these facts should be kept in mind when determining what weight to give defendant's assertions about abuse she suffered as a child.

2.    Government's Sentencing Recommendation

The government recommends that the Court sentence defendant to a term of imprisonment of at least 41 months, the low end of the sentencing range suggested by the advisory Sentencing Guidelines.  The government's recommendation is based on the following factors, which the government believes are aggravating factors that justify a sentence at least at the low end of the advisory Sentencing Guidelines range, even if the Court were to apply an "offset" based on the abuse claimed by defendant and discussed in paragraphs 58-60 of the PSR.

a.    The Nature and Circumstances of the Offense, and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Provide Just Punishment

The government agrees with the USPO that the advisory Sentencing Guidelines take into account the amount of loss, the number of victims, defendant's acceptance of responsibility, and her criminal history.  The advisory Sentencing Guidelines do not, however, fully take into account the nature and circumstances of the offense, the seriousness of it, and the need to provide just punishment for it.

A starting point for determining an appropriate sentence for fraud crimes is adding amount of loss and a number of victims to a base offense level.  But those guidelines, like the advisory Sentencing Guidelines generally, are only a starting point. Here, defendant's fraud crimes were not a "run of the mill"

2

scheme in which the defendant simply tells lies that cause victims to lose money, however, and the advisory Sentencing Guidelines calculation does not fully account for the circumstances of defendant's fraud crimes.

It is true that defendant's fraud scheme left a trail of distraught victims across the entire United States, as well as Canada.  The factors not accounted for in the advisory Sentencing Guidelines calculation, however, are include that defendant's crimes also (1) involved significant cruelty to helpless and often distressed animals dependant on defendant for care; and (2) were committed with a complete disregard for significant risks of serious injuries or death to defendant's victims and their loved ones.  The government believes that these aggravating factors justify a sentence within the Sentencing Guidelines range, at least at the low end of that range, even after accounting for mitigating factors related to defendant's upbringing.

              i.    Abuse and Neglect of Animals

Attachment 1 to the Factual Basis supporting defendant's plea details several instances of the serious abuse and/or neglect of animals.  See Plea Agreement Factual Basis, Attachment 1 ¶¶ 1-4, 6, 8, 9, 11, 12, 14-19, 21, 23, 25, 27.  One of defendant's former employees, J.S., has informed the government of significant other serious abuse and/or neglect of the horses defendant sold.[2]

According to J.S., defendant would purchase horses at

_____

[2]  J.S. was interviewed twice by the FBI, once together with the Assistant United States Attorney assigned to this case.  The FBI's reports of the interviews of J.S. have been produced to defendant.

auction and then resell them through Internet advisements. Horses that were not sold within a month were returned to auction and re-auctioned.

Defendant kept the horses in a fenced area on the property where defendant lived. According to J.S., "[t]he question was not when were the horses fed, but 'if' the horses were fed or had water." On many occasions, horses had no water.[3] (J.S. recalls that a baby goat was kept in a pen on the same property and died of dehydration.)

When her horses were fed, defendant fed them by leaving feed out. J.S. witnessed horses fighting over food and water that were provided. The ground in the area in which the horses were kept was "picked clean" of grass, according to J.S., who witnessed horses trying to dig under the fence to try and eat grass on the other side of it.

Apart from a single horse that was checked by a veterinarian before being shipped out of state, J.S. does not recall any veterinarian ever attending to any of defendant's horses. Defendant's horses were also never seen by a farrier. According to J.S., "If a horse came from the prior seller to [defendant] with trimmed hooves, the horse had trimmed hooves. If the horse did not have trimmed hooves by the previous seller, [defendant] did not get the hooves trimmed."[4]

---

[3] J.S. has kept horses throughout her life and knows that horses need access to water throughout the day.

[4] The plea agreement discusses two horses defendant advertised as registered, healthy, and sound, but which in fact had hooves that had been untrimmed so long that the horses were unable to walk. The same horses were so underweight that the horses' ribs were visible. Plea Agreement Factual Basis,

4

Although defendant would also not have her horses shod or have missing shoes replaced, defendant would instruct J.S. to ride horses missing one or more shoes.  According to J.S., if a horse has "slipped a shoe," the horse is unbalanced, and riding it in that condition could cause the horse to develop a bowed tendon, a condition painful to the animal and disruptive of a horse's ability to carry a rider or, for that matter, to walk.

J.S. also never witnessed any of defendant's horses receiving a vaccination from any other person, and J.S. herself on only two occasions vaccinated a horse owned by defendant.

J.S. recalls horses being injured on defendant's property. J.S. recalls an incident in which a thoroughbred broke or dislocated its hip by running into a fence on the property. A trainer J.S. knows offered to take the horse to the veterinarian. The trainer proposed that the trainer would pay for the horse's veterinary care and then keep the horse.  That way, defendant would not have had to pay for the veterinary care and the trainer would not have to pay any additional purchase price for the horse.  Defendant instead took the horse to auction to be sold. J.S. does not believe the horse's injury was ever treated by a veterinarian.

J.S. also recalls one of defendant's horses being "euthanized" by being shot in the head with a handgun.  The horse had been injured when it went wild in a horse trailer.  The horse was then removed from the horse trailer by tying a rope around a tree and around the horse and pulling the trailer away with a

---

Attachment 1 ¶ 19.

truck.

Most fraud schemes to do not involve the abuse and neglect of animals, but defendant routinely abused and neglected animals in the execution of her fraud scheme. This is a significantly aggravating factor in the government's view.

### ii. Disregard for the Safety of Others

In addition to the animal abuse described above, J.S. also informed the government that defendant would drug horses to make them appear healthy or docile when showing the horses to prospective purchasers. PSR ¶ 14. If, for example, a horse was broken-down, defendant would give the horse a pain relieving drug to make it appear healthier than it in fact was. Conversely, defendant would give a wild horse a different drug to make the horse appear lethargic and to disguise its temperament when showing it for sale.

The victim described in paragraph 7 of Attachment 1 to defendant's Plea Agreement provides an example why this is perhaps even more aggravating than defendant's abuse of and cruelty to the horses she kept and offered for sale, at least in the government's view.[5] In 2005 and 2006, eleven-year old M.K. lived in Desert Hot Springs, California. In mid-December 2005, M.K. found an advertisement for a sorrel Mustang mare, "Spirit," that defendant had placed on Equine.com. The advertisement described "Spirit" as "trained" for "beginner/family" and as "bombproof," meaning that the horse was suitable for a beginner

---

[5] The following facts are taken from FBI reports produced to defendant. Those reports are available to the Court on request. The agent who conducted the interviews, moreover, will be present at sentencing.

6

rider because it would not upset or scare at any strange sights or noises and would be forgivable of a beginner's mistakes.

M.K.'s mother, Jonatha Kalayjian, questioned defendant extensively about "Spirit's" temperament, making sure the mare would be safe for her eleven-year old daughter to ride.  Over the telephone, defendant told Ms. Kalayjian that defendant "wouldn't let [her] 5-year old on the horse if it wasn't safe" and indicated that defendant's five-year old daughter had been riding "Spirit" for over one year.  Defendant also provided Ms. Kalayjian a 14-day "satisfaction guarantee" and indicated that Ms. Kalayjian could exchange the mare if she was unsatisfied with it.

On or about January 3, 2006, Ms. Kalayjian wired $1400 into defendant's Bank of America account.  On January 5, 2006, defendant delivered "Spirit" to Ms. Kalayjian's brother-in-law, who is knowledgeable about horses.  The brother-in-law told defendant that "Spirit" appeared lame.  Defendant blamed the horse's ambulatory difficulties on the horse trailer.

On January 6, 2006, the Kalayjian family traveled see "Spirit" for the first time.  When they saw the mare, "Spirit" appeared very lame, one of the mare's back legs stuck out straight, and "Spirit" was very wild.  Defendant would not answer or return any of Ms. Kalayjian's telephone calls for six days. It was not until Ms. Kalayjian called from another telephone number that defendant answered the telephone.  Defendant blamed Ms. Kalayjian for the mare's condition.  This was the last time Ms. Kalayjian was ever able to get a hold of defendant.

On her own, Ms. Kalayjian located "Spirit's" previous owner,

7

Kevin Kennedy.  Mr. Kennedy recognized "Spirit" as "Rosie," as a horse he had purchased in November 2005, and then auctioned December 5, 2005, because "she was not even halter broke" when Mr. Kennedy purchased her.  (At the auction, Mr. Kennedy had to lead -- not ride -- "Spirit" through the auction, because "she was [not] broke enough to handle the com[m]otion.")  Defendant bought "Rosie"/"Spirit" and two other horses from Mr. Kennedy.  Defendant paid $400 for "Rosie"/"Spirit."

Although it was plainly a lie that defendant's five-year old had been riding "Spirit" for one year, defendant obviously had no problem making this representation in order to sell an unbroken horse as "bombproof" and safe to b ridden by an eleven-year old child with no riding experience.  Defendant routinely made similar representations to other victims about particular horses being safe for children or beginner riders.  See Plea Agreement Factual Basis, Attachment 1 ¶¶ 1, 3, 5, 8, 9, 10, 13, 15, 22, 27.  At least as far as the government is unaware, mercifully, no one who was killed or maimed as a result of defendant's reckless behavior, although even a professional horse trainer was thrown from one of the horses defendant sold.  Plea Agreement Factual Basis, Attachment 1 ¶ 8.  The government's point is this: Most fraud schemes do not involve any serious risk of injury or death, but the fraud scheme devised and executed by defendant did.  This is another significantly aggravating factor, at least in the government's view.

b.   Defendant's History and Characteristics, and the Need to Promote Her Respect for the Law, Deter Her from Committing Future Crimes, and Protect the Public

As the USPO recognizes in its letter to the Court, defendant

appears to have little respect for the law, as evidenced by her four prior convictions, three of which involve theft by fraud. Although, two of defendant's prior theft by fraud convictions resulted in custodial sentences, defendant does not appear to have been deterred from committing crimes of fraud as a way of life.  A significant term of imprisonment is warranted to promote defendant's respect for the law, to deter her from committing future crimes, and to protect the public.  The government submits that a term of imprisonment within the range suggested by the advisory sentencing guidelines is necessary to achieve these purposes of sentencing.

3.    Response to Defendant's Sentencing Memorandum

As of the date of the filing of this Sentencing Memorandum, the government has not received a sentencing memorandum from defendant.  If defendant files a sentencing memorandum, the government will respond to it if the Court so directs or if, upon review, defendant's position appears to necessitate a response beyond any response provided by the USPO.