LAW OFFICES OF JOSEPH SHEMARIA
JOSEPH SHEMARIA
1801 Century park East, Suite 2400
Los Angeles, California 90067
Telephone (310) 278-2660
Facsimile (310) 988-2627

Attorney for Defendant
TRINA LEE KENNEY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR 10-00969-AHM |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS |
| v. | ) | |
| | ) | |
| TRINA LEE KENNEY, | ) | |
| | ) | Sentencing Date: April 7, 2011 |
| Defendant. | ) | Court: Hon. A. Howard Matz |
| | ) | |
| | ) | |

Defendant TRINA LEE KENNEY, through counsel, hereby and herewith submits her Sentencing Memorandum, with Exhibits.

Defendant reserves the opportunity to make additional comments through counsel at the sentencing hearing in this matter.

Dated: March 24, 2011

Respectfully submitted,

LAW OFFICES OF JOSEPH SHEMARIA

By      /s/ Joseph Shemaria
JOSEPH SHEMARIA
Attorney for Defendant
TRINA LEE KENNEY

## I.

## INTRODUCTION

On October 7, 2010, Trina Lee Kenney, age 32, pled guilty to a single count of mail fraud in violation of 18 U.S.C. §§1341, 2(b).  The charges stem from Ms. Kenney's sale of horses over the internet under false pretenses between November 2004 and June 2008.

It is understood that the amount of financial loss and the number of victims make Ms. Kenney's conduct serious.  These factors are reflected in the advisory guidelines.  The Government and the Probation Office both recommend a guideline sentence of 41 months.

This is a case, however, in which the guidelines do not provide adequate guidance as to what would constitute an appropriate sentence.  Examination of Ms. Kenney's history and characteristics reveal a young woman who has struggled with mental health issues throughout her life.  Although her father made a good living as an architect and Ms. Kenney grew up in materially comfortable conditions, from an early age she showed clear signs of mental imbalance.  Her psychological unrest was exacerbated by sexual abuse on the part of her parents' live-in housekeeper when she was in elementary school.

Ms. Kenney's parents Joel and Riva Colombo have described in detail the psychological problems that she experienced from early childhood, and the family's well-meaning but often ineffectual attempts to deal with her.  It is quite clear that Ms. Kenney never socialized normally with other children, always struggled in school, and suffered from low self-esteem and depression as well as a fear of crowds, enclosed spaces, and various other situations that most people take more or less in stride.

Ms. Kenney's saving grace from as early as the age of four or five was her great love for animals and horses in particular.  She got her first horse when she was five years old and was closely involved in caring for, training, and riding horses from that point on.

Until the age of 18, Ms. Kenney was never in trouble with the authorities.  With her parents' help and encouragement, she had begun working with underprivileged inner city children at around age 15, introducing them to animals both in Wrightwood where she lived

and at the Dream Center in Los Angeles.  Her career goal was to combine her interest in horses with working with disadvantaged youth.

Ms. Kenney's mental equilibrium, which was always fragile, was fragmented by her choice in marriage.  She met her future husband Richard "Rick" Kenney at a church function when she was 18 and eloped with him a few weeks later.  Trina's husband, Mr. Kenney, appears to be highly manipulative with pronounced criminal tendencies.  Although he and Ms. Kenney have three children, he has rarely held a job.  The Kenneys and their children have been largely supported by Ms. Kenney's parents and her maternal and paternal grandmothers.

In 2003, Reuben P. Gomez, Ph.D., a psychologist in Wrightwood, California met with Ms. Kenney and her husband for marital counseling.  In a report that he has provided (Dr. Gomez's Evaluation is appended as Exhibit C), he summarizes Ms. Kenney's relationship with her husband as one of "long term neglect and abuse."  This causes her substantial disequilibrium that subsides to some degree when she is separated from him. Dr. Gomez opines that Rick Kenney's systematic mistreatment of Ms. Kenney, particularly his attempts at domination and her response to it, is reminiscent of the Stockholm Syndrome, a paradoxical psychological state in which victims express adulation and have positive feelings toward their victimizers.  Ms. Kenney lives in fear that she will lose her children if she ever disentangles herself from Rick Kenney.[1]  It should be noted that for all her problems, Ms. Kenney has consistently been a kind and caring mother to her three children.

To gain further insight into Trina Kenney's functioning and personality, she received an Independent Medical Evaluation by David N. Glaser, M.D., the Medical Director of Cal Psych FMT in Encino, California [(818) 385-0050].  Dr. Glaser finds that Ms. Kenney

---

[1] No charges have been brought against Rick Kenney.  However, the Stipulated Factual Basis, which was filed in conjunction with the Plea Agreement, recites:  "During the period November 2004 through 2008, defendant Trina Kenney, with the intent to defraud, devised and, *together with her husband*, executed a scheme to defraud at least 61 prospective horse purchasers (collectively victims)…" *[Italics added.]*  In Paragraph 12 of the PSR, the U.S. Probation Officer refers to Rick Kenney as "the uncharged co-schemer."

suffers from longstanding serious depression for which she has not received needed psychotherapy.  Although she has taken antidepressant medication, it has not adequately treated her Major Depressive Disorder.  Dr. Glaser reports that Ms. Kenney also has had a longstanding and preexistent Personality Disorder with Narcissistic, Avoidant, Dependant and Borderline Features that, when untreated, has impacted her day-to-day functioning, life decisions and judgment (see Dr. Glaser's Evaluation, Pages 4-5).

## II.

## RECOMMENDED SENTENCE

In assessing this case, this Court is asked to give appropriate weight to Ms. Kenney's psychological condition and its relationship to her legal problems, as well as the fact that she is the mother of three dependent children.  She does not appear to be anti-social by nature.  Rather, she is a vulnerable and fragile young woman whose difficulties have been exacerbated by her unfortunate choice of marital partner.  With this unusual set of circumstances in mind, Ms. Kenney respectfully requests that, in lieu of incarceration, this Court consider a lengthy term of structured probation accompanied by mental health counseling and treatment.

Ms. Kenney has had a hard life but she is not unredeemable.  She needs treatment, not imprisonment; it would be provident at this crossroads in her life to let her receive the professional help she needs.

## III.

## GUIDELINE CALCULATIONS AND COMMENTS
## ON THE GOVERNMENT'S SENTENCING POSITION

The parties and the Government are in agreement that Ms. Kenney's total offense level is 20, which at Criminal History Category III, equates to a guidelines range of 41 to 51 months.  The Guidelines are derived from a base offense level of 7 [U.S.S.G. §2B1.1(a)(1)]; a 12-level increase for loss of over $200,000 [U.S.S.G. §2B1.1(b)(1)(G)]; a 4-level increase for 50 or more victims [U.S.S.G. §2B1.1(b)(2)(B); and the 3-level reduction for acceptance of responsibility [U.S.S.G. §§3E1.1(a)&(b)].

Ms. Kenney, through counsel, has no objections to the Probation Office's guideline analysis and criminal history calculation.  She does feel that the Probation Office fails to give sufficient weight to the factors in mitigation, particularly her mental illness and her family responsibilities.

In its Sentencing Position which was filed earlier this month, the Government's claims that Ms. Kenney's criminal conduct "(1) involved significant cruelty to helpless and often distressed animals dependent on defendant for care; and (2) were committed with a complete disregard for significant risks of serious injuries or death to defendant's victims and their loved ones" are not adequately supported and miss the mark.  They represent an attempt by the prosecution to introduce an emotional red herring into the sentencing discussion that is neither helpful to the process nor fair.  The one consistent fact about Ms. Kenney that everyone who knows her all agree upon is that she loves animals.  This affinity began when she was four or five years old and has been a constant in her life.

The Government relies in making its assertion on the word of a 19-year-old female referred to as J.S., an alleged former employee of Ms. Kenney.  For a period of approximately two months in 2005, J.S. spent some time at Ms. Kenney's property where she kept her horses.  At the time, J.S. was 13 or 14 years old.  Like Ms. Kenney, she was fond of animals and Ms. Kenney allowed her to ride their horses.  But J.S. was never an employee of Ms. Kenney's.  Although various "horse people" would occasionally help Ms. Kenney care for the animals, she did not have employees and did most of the work by herself.

After J.S. had been spending time at the property for around two months, Ms. Kenney perceived that an inappropriate attraction was developing on J.S.'s part toward the defendant's husband, Rick Kenney.  Ms. Kenney, who due to her oppositional disorder can be very abrasive, was furious with J.S. and banned her from her property.  Their relationship ended unhappily and J.S. is believed to bear a grudge against Ms. Kenney.  In light of these circumstances, J.S., who was in her early teens at the time and embroiled in a highly emotional dispute with the defendant over personal issues, can hardly be relied upon

for what is, in effect, expert witness testimony on the quality of care that Ms. Kenney provided for her animals six years ago.

The fact is that if Ms. Kenney had really abused or mistreated her horses, it is likely there would have been complaints and that the Animal Control authorities would have taken certain legal action to put an end to any such abuse. Although the Animal Control authorities did, in fact, come out to Ms. Kenny's house some 50 to 60 times, it was solely because of calls concerning alleged abuse of animals by her longtime, firmly entrenched nemesis, Alcina Talbott. On one occasion Animal Control did remove several horses that appeared to be malnourished. However, they did not realize that Ms. Kenney had just basically rescued those few horses the evening before at an auction.

Although it is certainly possible that Ms. Kenney, due to her mental illness, was not always equipped to take as good care of the horses as might have been optimum, the claim that she purposely abused or mistreated them is groundless.  She obtained the horses at auctions quite inexpensively (paying as little as three to four hundred dollars sometimes) and they were often in bad shape when she got them. On occasion, she would take malnourished horses from the auction to care for them. Her crime was misleading the victims as to the condition or pedigree of the horses.  Ms. Kenney takes full responsibility for her fraudulent conduct, which is why she entered a plea of guilty.  This, however, is quite apart from the insinuation that she systematically mistreated the animals, which seems to have become a centerpiece of the Government's sentencing arguments, perhaps because the has more "emotional appeal" and would hence, result in a heavier sentence. Regardless of its emotional appeal, or lack thereof, it simply is not true that Ms. Kenney ever mistreated any of the horses. She may be guilty of bad judgment, dishonesty and fraud on the victims, but to throw in being cruel to animals is simply not true, as a government well knows.

The Government's claim that Ms. Kenney put others at physical risk by selling them the horses is equally disingenuous and not credible.  It may be true that Ms. Kenney misled Jonatha Kalayjian as to the condition of a broken-down horse named Spirit.  This does not

mean, however, that Ms. Kalayjian's 11-year-old daughter was placed in imminent jeopardy, or that Ms. Kenney otherwise endangered human life, as the Government alleges. The horse was apparently lame and in no condition to be ridden. Ms. Kenney has admitted to deceptive or fraudulent representations as part of her guilty plea, but this case should not devolve into an argument that she jeopardized public safety on a serious scale as the prosecution seems to suggest. Aging, ill-tempered, or otherwise broken-down horses such as Spirit are sold by private parties or at auctions every day all across America. For that matter, second-hand cars with deteriorating tires or mechanical function are sold by the millions as well. Will Federal prosecutors begin bringing cases against individuals for selling used cars with bald tires or faulty brakes?

The Government's attempt to demonize Ms. Kenney as a dangerous threat to either human or animal safety should be disregarded. Their reliance on innuendo, exaggeration, and the unverifiable reports of a young woman with a personal animus against Ms. Kenney should be given little weight. Ms. Kenney's battery of mental illnesses, the childhood sexual abuse she endured, and the fact that she is the mother of three children who depend on her care, all weigh toward a sentence of probation with the requirement of financial restitution and long-term mental health treatment, rather than a term of imprisonment.

## IV.

## THE HISTORY AND CHARACTERISTICS OF DEFENDANT TRINA KENNEY MILITATE TOWARD A REDUCED SENTENCE

The following social history of Trina Kenney is provided to the Court in the spirit of 18 U.S.C. §3661, which states that "no limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense."

- *Family Background*

Trina Kenney was born in Bakersfield, California on July 12, 1978. She is the oldest of three children born to Joel and Riva Colombo.

Trina's father Joel Colombo was born in 1953 in Orange, California. Joel's father was an architect whose firm erected over a thousand churches throughout the United States

and abroad.  Joel is the owner of Architect Builder Colombo, a family-run business in Wrightwood which designs and builds schools, churches, theatres, and auditoriums.

Trina's mother Riva Lee Colombo was born in 1952 in Bakersfield, California.  She works with Joel at Architect Builder Colombo as a market analyst.  Riva's father was a protestant minister before becoming involved in real estate development.  He helped develop the master plan for the city of Palmdale among other municipalities.  Riva's mother was a homemaker who spent much of her time with Trina when she was a child.

Trina's sister, Kerri Lee Colombo, age 26, graduated from Vanguard University with a Bachelor's degree in Business and a Master's degree in Leadership.  She also studied architecture at Harvard University and now works as an associate designer for her father's company.  Joel Colombo II, age 22, also majored in Business at Vanguard University, with a minor in Cinematography.  He is the project developer with Architect Building Colombo.  Both Kerri and Joel II reside in Wrightwood with their parents.

Trina has two sons, Elijah, 12, and Jezriel, 10, and one daughter, Priscilla, age 3.  They currently reside with Trina and their father, Rick Kenney, in Pinon Hills, California.

- *Childhood*

Trina Kenney lived in Tustin in Orange County until she was 14 years old.  Although Joel Colombo's design business was successful and the family was well-off materially, Riva and Joel Colombo noticed odd behavioral traits at an early age in Trina.  Normal stimulation seemed to overwhelm her and she was prone to crying attacks.  Joel Colombo writes to the Court:

> At the age of 3, she had started to show signs of emotional problems.  She was unable to cope with certain environments.  Crowds or having too many people around scared her.  These situations would stress her to the point where she would lay on the floor kicking her feet and screaming.

In an interview conducted in preparation of this memorandum, Trina recalled:

> I used to throw out of control fits.  Once I kicked a hole in the

> window of my parents' Suburban.  The first fit I remember was when I was about 4.  My parents had friends over.  I remember laying on the floor kicking the coffee table, slamming doors and screaming.  Thank God my own kids don't have problems like me.

Trina was Joel and Riva's first child and they were naturally very concerned about her outbursts and tantrums.  Riva Colombo reports that they consulted with a psychiatrist in Palm Springs who suggested that Trina could not process information like other children which was why she would get overwhelmed so easily.

Trina attended Tustin Elementary School from kindergarten through the sixth grade.  She was not a good student and had difficulty making friends.  Although Trina criticizes her parents for being overly restrictive and judgmental of other children, it appears that Trina's problems socializing were primarily a function of her emotional problems.  Trina recalls:

> I hated school.  I got teased a lot about my weight.  It was hard for me to learn.  I would pretend I was sick so I didn't have to go.  I would beg my mom to let me stay home.  My parents talked to lots of doctors over the years but I was never that cooperative.  I don't know why.

Trina's grades were generally somewhat below average.  Her parents became aware that she had visual perception problems when she was in the seventh grade in Orange County.  One day she came home from school in tears because her teacher had pointed to a line in a book and the words had begun moving around.  Trina was completely terrified and the school referred Trina and her parents to a child psychologist.   She was also referred to an ophthalmologist and eventually to a psychiatrist who placed her on Zoloft, which she has taken ever since.  The professionals surmised that Trina's visual perception difficulties were related her inability to handle noise, crowds, and high levels of stimulation.

- *Punishment Issues*

Trina's parents readily admit that they spanked her during her childhood.  She was hard to handle and Riva and Joel did subscribe, to some degree, to the old-fashioned "spare the rod and spoil the child" philosophy.  Although Trina has informed both the Probation Officer and Dr. David Glaser, the psychiatrist, that she was abused by her over-controlling parents, this claim may well be, at least in part, a function of her mental imbalance.  In conversations with Trina's parents, it seems obvious that whatever their shortcomings may be, they are extremely concerned about their daughter's welfare.

• *Affinity for Animals*

Throughout Trina's childhood there was always one bright spot  --  her natural ability to relate well with animals.  Riva Colombo writes in her letter:

> Trina's father gave her a horse when she was five years old…
> Mr. Stubs was Trina's first pony…  Everyday after school she
> would hurry home to be with her horses, feed and take care of
> them.  They became her friends and she loved them.  She
> entered horse shows and won many ribbons, weekend after
> weekend, year after year.  Trina's life became her horses…
> They seemed to bring peace to her.  She understood them and
> they understood her.  Trina had developed a bond and trust with
> her horses like I have never seen before.  By the time she was in
> junior high the local park…where she took horseback riding
> lessons had her caring for the horses and asked her to ride the
> horses before they put other children on them…

From that point on, Trina was always around animals.  During the course of her childhood, she raised pigs, goats, cows, sheep, chickens, dogs, and ducks.  There was still plenty of open space in Orange County and there was room for animals.  Trina's cousin Mindy Weinstein writes:

> With only a one-year difference in our ages and a distance of
> only five minutes between our homes, we spent countless hours

and days together.  I…watched as her love for horses blossomed.  We spent many summers riding horses through the neighborhood.  Back in those days, Trina would spend time teaching me how to properly care for these amazing creatures.

The adult that Trina was closest to throughout her childhood was her maternal grandfather Harold McNaughton.  Harold owned a farm near Bakersfield where he raised hundreds of cows, sheep, and horses.  Trina spent most of each summer there.  She loved the open spaces and was not plagued by the perceptual overload that plagued her in more contained surroundings.  Mr. McNaughton, who was aware of Trina's emotional problems, went out of his way to be nurturing and they developed a close relationship.  Recognizing her sure hand with animals, he would put her in charge of feeding, watering, and caring for them.

Trina's grandmother Helen McNaughton writes:

Trina has always loved animals.  She has had dogs, rabbits, a pig, a goat and horses.  I have never seen her mistreat an animal. Trina's grandpa, (my husband) spent many days with her on the farm.  She and my husband both had a love for animals and I believe this and her problems is what brought them together.  He loved and cared for her and when he died it was sad for all of us.

When Trina was 13, she obtained a part-time job at a feed store near Irvine Park.  She rode there on her horse by way of the local trails.  Her job was to feed the animals and sweep-up.  Trina's paternal uncle Charles Colombo writes:

She…has always enjoyed horses and riding.  When she was a young girl, she gave riding lessons to children and adults alike. She cared for her own horses and taught others how to care for theirs.  She has always been passionate and caring toward animals.

Paternal uncle Dwight McNaughton adds in his letter:

…I have never seen Trina be cruel to any horse, pony or any other animal… In fact, she had a closer relationship with her animals than she did with some people. Our family owned a ranch that had numerous animals and Trina always treated them very well.

- *Sexual Abuse*

Trina's parents had a live-in housekeeper in Orange County for several years. The housekeeper's brother also worked for the Colombos doing outdoor maintenance. When Trina was 12, she told her parents that she had been sexually molested by the housekeeper on a regular basis for about two years between the age of 7 and 9. She believed she had also been molested by the housekeeper's brother although her memories of that were not specific. For the next several months, Joel and Riva took Trina to a female counselor in Buena Park who eventually referred them to a male counselor who was not successful in getting Trina to talk about her feelings. Although it could be argued in hindsight that the Colombos should have pursued this type of professional help further, there is no doubt that they were attentive to Trina's many problems.

- *Move to Wrightwood*

When Trina was 14, the Colombos moved to Wrightwood in the San Bernardino Mountains. From that point on, Riva home-schooled Trina along with her younger brother and sister, both of whom suffered from severe asthma. Being surrounded by the countryside and freed from the social stressors of the school system agreed with Trina, and over the next four years she engaged in multiple activities at the personal and community level. Pastor Alan G. Phillips, Ed.D, writes:

I visited…and stayed at the Colombo home in Wrightwood with my wife and was taken for a horseback ride in the hills with Trina's help. Trina was most helpful to my wife and me since we have limited experience in riding horses. Trina was good to the animals and most helpful to us. We left their home in

Wrightwood impressed with Trina's animal husbandry skills and compassion for all animals and willingness to help others. Trina was a young lady at that point with, in our opinion, great promise for the future.

Seven-time Grammy winning gospel artist Andrae Crouch is Trina's godfather. He adds in his letter:

I have known Trina for 32 years since she was 6 months old. I always tease her about her crying when she first met me as a baby, I thought it was because I am black but her parents would reassure me that Trina always had trouble meeting new people and before long we became great friends…

One day while I was at the house Trina brought over a big black horse for me to ride. Trina put a cowboy hat on me and the horse was all saddled up and she had a big smile on her face. I was cautious at first, I had never ridden a horse much less been around them growing up, but Trina assured me everything would be ok. Trina walked me around the property a few times to calm me down and show me what to do, then I was on my own, I had a great time! Afterwards Trina removed the saddle and I watch(ed) as she brushed him down. Many times I have seen Trina go out in the freezing snow and feed and water her horses…

Trina's brother Joel describes:

I believe that Trina has a love and deep understanding for horses that most people who are involved with animals wish they could attain. All the years of growing up with my sister and seeing her care for animals she is definitely a good animal caregiver. No

matter how bad the weather was or how sick Trina was she would always feed and water her Horses.  She was practically a vet without the training of a school.  She always knew how to take care of her pets.

Perhaps due in part to her own psychological problems, around the age of fourteen, Trina became concerned about the well-being of at-risk children.  Camp Mariastella is a non-profit camp for children near the Colombos' home that was chartered by the Sisters of Social Service in 1941.  Riva Colombo writes:

In high school Trina began giving horseback riding lessons from our home.  She also donated her time in the summer for free, teaching the inner city kids about horses and animals at the Catholic church camp next to us.  She would get up early feed all the animals, brush them and make sure they were ok.  Then she would prepare a lesson for the kids about the animals and their care.  She would let the kids participate by petting or feeding the animals…

When Trina was 17 she came to me and said she wanted to take her horses to the inner city where kids could experience the horses and ride them.  She has a heart for kids…  We contacted the Dream Center that is in the middle of L.A. they do an outreach in the community and they asked her to come and bring her horses.  So every Saturday Trina would get up early before the sun and feed and water the horses, load the horse trailer and drive an hour and a half to L.A…  As I sat under the shade tree while Trina led the horse around by lead rope, not caring how hot of a day it was, I realized I had a daughter who really cared for others.  Trina has also been assistant coach of the little

league team and the leader of the 4-H in our community.  Her 4-H group won a trophy for learning about horses and their care.

Human Behavior Specialist and family friend Marvin Smith, M.A. adds:

> In reference to Trina, I am outright baffled!  The Trina that I know and care so much for is not the individual I have witnessed in recent years.  I knew a girl who loved kids, youth, horses, and her faith.  We would always discuss how someday we would work together where she would use her skills of loving kids and equine as a method of therapy helping to reach at-risk or physically challenged kids.  ..her eyes would light up and she would get so excited.  Even as she started to pursue her college degree, it was in hope of fulfilling her dreams of helping kids.

Andrae Crouch states in his letter:

> Trina had always talked to me about having a ranch for the inner city kids.  I thought it was a great idea…  Many times she has helped gather toys and passed them out at our outreach we have for the community.  Last year Trina helped me with new bikes for the kids and dolls, her kids were right there with us too.  The night before the outreach she was working almost all night.  She was hauling the toys in her pickup truck and unloading them too.

Trina's sister Kerri Colombo writes:

> Many times I have seen her prepare lunches, sleeping bags, and jackets that she would pass out to the homeless on the streets… Trina's selfless acts of kindness have encouraged me to use my own efforts and abilities to reach out to those in need…

Helen McNaughton adds:

> Trina has a lot of compassion for the homeless and needy.  I have seen her take and use her own money, even when she was

in need, and buy blankets and hand them out to the street people on the streets of L.A.  She has also collected and bought Christmas toys with her own money for the children of a low income area of L.A.

Around the time she was finishing up her home study, Trina decided that she wanted to learn more about horses with the eventual goal of perhaps becoming a veterinarian.  She had seen horses grazing at Cal Poly in Pomona and decided she wanted to go there to pursue equine studies.  Her academic deficiencies precluded her from being formally accepted into the university, but Riva was able to arrange for Trina to attend initial classes on a non-credit basis.  Riva recalls that she had never seen her daughter quite so excited, and for several months Trina did her best to keep up with the course curriculum.

• *Grandfather's Death/Marriage to Rick Kenney*

Not long after Trina started attending Cal Poly, her grandfather Harold McNaughton had a fatal heart attack.  She took his death very hard.  She had placed great trust in him and he had been an immense support to her.  A couple of months afterward Trina met her future husband Rick Kenney while handing out bibles at a church function.  She eloped with him weeks later.

Riva Colombo writes to the Court:

> …our biggest nightmare happened when she met her then 24 year old husband Rick and left with him after just turning 18. He conned her into leaving with him, he said that he was interested in helping her and that he loved horses and wanted to help troubled kids.  I begged and cried, but he took her away. She was 18 and we couldn't do anything…  Trina was vulnerable and believed everything he told her.  We hired a detective and he told us all about Rick's criminal record and all the people he has conned.  Trina on the other hand had never been in trouble with the law before…

Trina has now spent over 14 years with Mr. Kenney.  He has abandoned her repeatedly, only to return each time to exert his control over her.  He has rarely worked and he and Trina and their three children have been largely supported by Joel and Riva.  They have lived in various places and states, but always return to the Wrightwood area where Riva helps Trina care for her children.

Prior to eloping, Trina had the solid support of Joel and Riva who spent huge amounts of time and effort propping her up and encouraging her in her endeavors.  They were not perfect parents but they never gave up in their effort to help their daughter navigate the vicissitudes of her troubled existence, and based on her many positive and socially productive activities, they helped her considerably.

Since Trina's ill-fated marriage, however, her husband's presence has cast a pall over the entire Colombo family.  Rick is a violence-prone alcoholic who has been both physically and verbally abusive to their daughter.

Marvin Smith, M.A., writes:

> Something happened when she met her husband, I started to see the ambition of a very intelligent, capable, dedicated, and personable young woman start to change.  Her life became more about her husband and protecting his dysfunctions than her, and even when she started having kids, it was still about him.  All of her dreams started to take a backseat in lieu [of] being totally enthralled with trying to be the savior of her husband.  I watched the bright lights of joy turn dark.  Trina lost sight of her own heart.

Her uncle Stan McNaughton adds:

> Trina always had problems as a child she seemed to get overstimulated with crowds or if there were too many distractions.  As she got older her problems seemed to worsen, but she wasn't a criminal and she never got in trouble with the

17

law until she ran off with Rick.  We all tried to help her.  I spent many hours trying to get through to her but it seemed as though Rick was brainwashing her against everything, her friends and family.  I could see she really needed help, but it was out of our hands.  That is why I am respectfully asking you Honorable Judge Matz not to incarcerate Trina but to give Trina a sentence of probation with community service and counseling.  Trina can be a productive citizen and I know as with others I will be there to help her.

In his report, Dr. David Glaser describes the relationship between Trina and her husband: [2]

Ms. Kenney's marital relationship is profoundly pathological. Her husband has exploited her vulnerability.  He has been financially supported by Ms. Kenney and there is hard evidence of longstanding antisocial behavior….

As a partial result of Ms. Kenney's rocky development, Ms. Kenney is desperately dependent upon who she perceives to be a powerful mate, who to some degree makes her feel whole. Though Rick has victimized Ms. Kenney on multiple occasions (her parents understandably provide a history that has more depth and breadth), Ms. Kenney has an intuitive appreciation that her children might be taken from them were she to leave.

There is hard forensic evidence that years before the subject events a marital therapist documented serious psychopathology in the marriage.  This psychologist went as far as writing that

___

[2] See Paragraphs 9, 12, and 13 of Dr. Glaser's Evaluation.

The Stockholm Syndrome explains how it is that Ms. Kenney remained in this disturbed relationship.  Dr. Gomez's notes provide hard forensic data that a neutral party recognized antedating subject events that Ms. Kenney was in an abusive marriage.  Considerable forensic weight is given to those records.

Dwight McNaughton writes:

Trina, in my opinion, is extremely protective of Rick and will do anything he tells her.  I have never personally known anyone like this and don't understand why Trina can't think, talk or act on her own behalf.  I believe, that in psychological terms, it is referred to as "Stockholm Syndrome."  I strongly feel that Trina needs psychological help…  One good thing about the fraud charges is it might force Trina to get the mental and professional help she so desperately needs.  Again I don't mean to be taking the blame off Trina and putting it on someone else, but there are times when there are extenuating circumstances that leads a person to do things they normally would not have done on their own out of fear, blind love, or under psychological control of another person.

- *Ms. Kenney's Remorse*

  Although Ms. Kenney is clearly still ambivalent about her relationship with Rick Kenney, there is no doubt that she now grasps how wrong her actions were.  In his letter, her father Joel Colombo writes:

The Court has had Trina's cooperation from the first communication through all of the proceedings without an indictment…  I think Trina's immediate and continued cooperation shows positive change in her life, which has been

evident during recent years.  Trina's remorse is manifested in her day to day sadness as she wakes up each day to what has transpired.  I think this experience has taught Trina to be aware and more sensitive to her psychological needs and to want to receive help from professionals.  Trina has consistently attended all her psychiatric and psychologist appointments with both private and court appointed doctors.

Andrae Crouch expresses:

Trina has told me she feels bad and remorseful for everything.  I know that for the last few years she has been a good citizen, she lives by her parents and is contributing to society, incarceration would be a loss to her family and the community since she is so involved in helping people and has learned from this experience.  It has been devastating on her whole family including her Dad, Mom, brother, sister even her extended family of uncles, aunts, cousins and her grandmothers.  I know this family personably and they will be there to help her every step of the way, and so will I.

- *Ms. Kenney's Duties as a Parent*

Although Trina's life has been, in many ways, very difficult, there is no doubt that she is an attentive and loving mother to her three children.  Janet Simonelli, a District Human Resources Manager with Home Depot, writes:

I have had the opportunity to witness Trina with her children and family on multiple occasions and she has always impressed me with her kindness and gentleness.  She treats her children with respect and empathy and her children are her priority.  Any time away from her children would have a harmful effect on both Trina and her children.

Mindy Weinstein, Trina's cousin, writes:

> Throughout the years, I have watched as Trina has grown into a caring and loving woman. She loves her children and would do anything for them. Trina is a truly wonderful mother.
>
> As a wife and mother of two young boys, I recognize the importance of family. Children need their parents. I can't begin to imagine how difficult it will be for Trina's three children if their mother is taken away from them even for a short period of time.

Trina's aunt Cara J. Earp adds:

> Her middle child and my youngest child were born the same year. The two girls share the love of horses… Jezriel and Elijah are healthy, bright and well-mannered children. If there is concern regarding her mothering skills it is unknown to me.

Kerrie Colombo writes:

> Her children have been tremendously affected by this situation as well. It has caused them sadness and a large amount of stress not knowing what will be the outcome of the situation, and whether or not their mother will be leaving them. These children really need their mother around. They are all still young, 12, 10, and the smallest is only 3. It will break my heart to see what will happen to them if their mother is not in their lives… She rides her horses with the two oldest children very often. She plays on the trampoline with them, and she takes them to Disneyland. She reads them stories, plays with them and laughs… I have seen her be such a fun loving mother to her children, they would be so lost without her.

# V.

## MS. KENNEY'S MENTAL AND EMOTIONAL PROBLEMS

## SUPPORT A MITIGATED SENTENCE

Trina Kenney has been deeply frightened by this entire experience.  Her contrition is real and she is trying hard to live a good life.  She is still trapped by her marriage and her fears of losing her children.  There is no reason to believe, however, that she could not gain real benefit from proper therapy and treatment.  The recently modified 2010 Sentencing Guidelines set forth at U.S.S.G. §5H1.3, Mental and Emotional Conditions (Policy Statement):

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines…

> In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose…

> Mental and emotional conditions may be relevant in determining the conditions of probation or supervised release; e.g., participation in a mental health program (see §§5B1.3(d)(5) and 5D1.3(d)(5)).

In the fall of 2010, Trina Kenney was interviewed by forensic psychiatrist David Glaser, M.D. on five occasions, both separately and with her mother Riva Colombo.  Ms. Kenney was also administered a series of psychological tests.  Dr. Glaser writes:[3]

> Ms Kenney has a longstanding serious depression requiring substantial doses of antidepressants.  This treatment has been

---

[3] See Dr. Glaser's Evaluation at Paragraphs 1, 2, 7, and 24.

required since age 16 for over half of Ms. Kenney's life. Despite taking antidepressant medication, Ms. Kenney has not been treated by a psychiatrist, has not received needed psychotherapy, and her recurrent Major Depressive Disorder has been under-treated.

Ms. Kenney has a longstanding and preexisting Personality Disorder with Narcissistic, Avoidant, Dependant, and Borderline Features.  This disorder, untreated as it has been, has profoundly impacted her day to day functioning, her life decisions, and her judgment…

Trina Kenney has profoundly low self-esteem.  This is not just some theoretical construct.  At the minimum, it fueled her choice in mates and, at least partially, provides some glue that keeps her in an abusive relationship.  The childhood verbal and physical abuse, her chronic depression, the limits upon her options due to her Personality Disorder, and her relational awareness that her husband is a verbally and physically abusive alcoholic, who is a chronic liar and with antisocial behavior, reinforce partially that she can do no better.

The initial antisocial subject events were driven by a perfect storm of converging factors: an identity of being a chronic victim, chronic poorly treated depression, a personality disorder, a means to maintain a relationship to a strong, charismatic, antisocial man, and a means to compensate for his financial irresponsibility.  Once started, they both slid down the slippery

slope of greed in the name of need.  It is impossible to apportion responsibility between Rick and Trina Kenney…

Dr. Glaser further clarifies at Paragraph 25:

Ms. Kenney's antisocial behavior is situational and, although she now appreciates that it was wrong, it is noteworthy that she has otherwise lived a prosocial life before her marriage to Rick. Her history, the results of the psychological testing and her mental status examination reveal that she does not have deep seeded antisocial character pathology.  This factor alone, were competent mental health services offered, bodes well with respect to prognosis.  Ms. Kenney is not a hardened criminal.

Although Ms. Kenney's psychological situation is complex, and she has suffered from mental imbalance from an early age, there is little doubt that given adequate long-term mental health treatment and appropriate psychotropic medication, she could eventually recover a reasonable degree of mental health.  The fact that she does not suffer from antisocial character pathology strongly supports the probability she would not be appearing before this Court for sentencing, were it not for the destructive influence of her husband.  (It is noted that Ms. Kenney's prior contacts with the law occurred mainly during a single 7-week spree in the summer of 2003 when, accompanying her husband from motel to motel, between different counties and states, they were arrested several times.)

## VI.

## CONCLUSION

If Ms. Kenney were a woman of sound mind and intellect whose illegal conduct was motivated purely by greed, a guideline sentence might arguably be appropriate.  There is a long tradition, however, in federal criminal jurisprudence to take into account a defendant's mental illness and, where the defendant is neither violent nor physically dangerous, to view the person's mental impairments as a mitigating circumstance that

weighs toward a lesser sentence.  Under the guidelines, this concept was known as Diminished Capacity, but on a more visceral level it is simply a matter of common sense and compassion.

Ms. Kenney's sojourn through the criminal justice system was fueled by obvious mental impairment.  Yet she is not a sociopath, and she likely would never have committed the offense but for her husband's toxic influence.  Simple logic suggests that her sentence should be calibrated to reflect and address these unique circumstances.  The United States Supreme Court noted in <u>Koon v. United States</u>, 116 U.S. 2035 (1996):

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States District Judge.  Discretion is reserved within the Sentencing Guidelines, and reflected by the standard of appellate review we adopt.

Since August of 2010, Ms. Kenney has taken steps toward a positive future.  She is attending a class called Celebrate Recovery which is geared toward dealing with alcohol addiction.  She is also involved in a weekly Bible study group.  Her uncle Charles Colombo writes:

> Trina has told me that she wants to do the right thing in order to get this part of her life behind her and move into a more positive situation where she can better help herself and her community.  She has expressed interest in becoming more involved in the ministry to help others who have suffered physical and psychological disorders.  She wants to be a testimony and encourage others to help facilitate positive

> changes in their lives.  I have already seen her ministry taking form as she has tried to help her sister with an eating disorder and her cousin with drug abuse as they have turned to her for help….

> I am optimistic that Trina is on the right track toward rehabilitation and self-improvement.  If she continues to help herself, I am confident that she will succeed at getting well and being a positive influence on others.  Trina has made strides at changing her situation.  She continues to move in the direction of recovery, education and family healing….

Trina Kenney has also returned to school, and is taking courses at Mt. San Antonio College where she hopes to earn an Associate of Arts degree.

Given the compelling factors in mitigation, it is respectfully submitted that a sentence of probation, coupled with extensive mental health counseling and treatment, a financial restitution order, and whatever other terms and conditions the Court deems appropriate, would be "sufficient, but not greater than necessary" to punish, deter, correct and rehabilitate Ms. Kenney, and would comply with the purposes of sentencing as set forth at 18 U.S.C. §3553(a).  Such a sentence would take into account this defendant's need for therapy and treatment for her mental conditions; her familial responsibilities to her three children; her contrition and regret for her criminal involvement; and her desire to move forward in a positive direction.  On the other hand, incarceration, given her vulnerable psychological state and innate fragility, would only serve to further damage this troubled yet ultimately redeemable individual.

//

//

//

//

Dated: March 24, 2011

Respectfully submitted,

LAW OFFICES OF JOSEPH SHEMARIA

By       /s/ Joseph Shemaria
JOSEPH SHEMARIA
Attorney for Defendant
TRINA LEE KENNEY