ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JOSEPH N. AKROTIRIANAKIS (Cal. Bar No. 197971)
Assistant United States Attorney
Public Corruption & Civil Rights Section
   1300 United States Courthouse
   312 North Spring Street
   Los Angeles, California 90012
   Telephone: (213) 894-2467
   Facsimile: (213) 894-6436
   Email:      joseph.akrotirianakis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>TRINA LEE KENNEY,<br><br>　　　　　Defendant. | ) No. CR 10-969-AHM<br>)<br>) <u>GOVERNMENT'S RESPONSE TO</u><br>) <u>DEFENDANT'S SENTENCING</u><br>) <u>MEMORANDUM (FILED MARCH 24,</u><br>) <u>2011)</u><br>)<br>) Sentencing Date: April 6, 2011<br>) Sentencing Time: 3:00 p.m.<br>) |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Joseph N. Akrotirianakis, hereby files its Response to Defendant's Sentencing Memorandum filed March 24, 2011 by defendant Trina Lee Kenney ("defendant").

//

//

//

//

//

//

For the reasons set forth in the attached memorandum and the government's sentencing memorandum filed March 2, 2011, the government continues to recommend that the Court impose the sentence recommended by the United States Probation Office.

DATED: March 31, 2011          Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

*Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
Assistant United States Attorney
Public Corruption & Civil Rights Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

<u>GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM</u>

1.    <u>Introduction</u>

Defendant "has no objections to the Probation Office's guideline analysis and criminal history calculations." (Def't's Sent. Memo. 5.) Although defendant agrees that the applicable guidelines sentencing range is 41-51 months, she nevertheless requests a probationary sentence, excusing her admitted criminal conduct largely based on the argument that defendant made an "unfortunate choice of marital partner." (Def't's Sent. Memo. 4.) In her sentencing memorandum, defendant also claims to have (a) been a victim of childhood abuse; (b) mental health issues; and (c) been a "victim" of having had strict, religious parents, all of which defendant asserts are factors of such mitigating value that they warrant a probationary sentence. These items, as well as defendant's abuse of animals and harm to her victims, are discussed below.

Defendant's arguments are based, in many respects, on misstatements of the facts, as described in detail below. Even if defendant's factual assertions were accepted by the Court, however, the sentence defendant requests would be unwarranted under 18 U.S.C. § 3553(a). Defendant offers no reason to believe that she will not continue her long history of fraud-related offenses against new victims. Nor would defendant's requested sentence of probation achieve the sentencing objectives of specific and general deterrence or the promotion of defendant's respect for the law any more than have defendant's multiple prior sentences of incarceration. Obviously, a probationary sentence would not adequately punish defendant or reflect the seriousness

1

of her criminal conduct.

In sum, defendant's requested sentence is inconsistent with 18 U.S.C. § 3553(a)'s directive that the Court "impose a sentence sufficient . . . "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant.  18 U.S.C. § 3553(a)(2).

2.   Defendant's Abuse of Animals

Defendant claims that she did not abuse animals as described in the government's sentencing memorandum, and that government witness J.S. is a liar who is motivated to lie to the government because, according to defendant, J.S. had -- six or seven years ago -- tried to make a pass at defendant's husband.  Def't's Sent. Memo. 5-6.  Putting aside that it would defy logic that J.S., now an adult, married, and a mother,[1] would have any reason to lie to the government, defendant has stipulated in the factual basis that supported her plea of guilty, that she (1) drugged wild horses to make them appear docile; (2) regularly sold sick

---

[1]   Contrary to defendant's assertions, that "for a period of approximately two months," J.S. "spent some time" at defendant's property until defendant banished J.S. for "developing" an "inappropriate attraction" to defendant's husband, J.S. has informed the government that, at the age of 15 and 16, she was employed by defendant for at least a year and a half, four to five days a week, at a hourly rate of $7 per hour, which was paid in cash without deductions and upon which J.S. has several times acknowledged she never paid any income tax.  Fed. R. Evid. 804(b)(3).  J.S.'s employment with defendant ended when defendant became furious that J.S. was unable to accompany defendant to a horse auction, because J.S. was caring for one of her own horses, a thoroughbred, that was having an allergic reaction.  J.S. is now 21 years old and lives in Colorado, where her husband is stationed.

and abused animals, some of which were so seriously injured or ill that they were unable to stand, walk, or eat and, in several cases, had to be euthanized; and (3) engaged in the interstate trafficking of horses that had no registration papers, health certificates, or interstate transportation certificates.  All of these stipulations are consistent with the statements of J.S., and the Court should consider defendant's attempts to deny those stipulations in evaluating whether defendant has, in fact, accepted responsibility for her criminal conduct.[2]

3.    Defendant's Disposition, Mental Condition, and Marriage

Defendant and her husband are well known to local law enforcement in San Bernardino County, based on several "call outs" related to domestic disturbance complaint of the "mutual combatant" variety,[3] in addition to multiple "call outs" in connection with defendant's fraudulent dealings with victims. According to San Bernardino County Sheriff deputies, defendant is not a fragile person who cowers at the sight of her husband or at his hand.  Deputy John Hayes, who will be present at defendant's sentencing hearing, states that it is defendant who "wears the

---

[2]    The notion, advanced by defendant, that the "50 to 60 times" animal welfare authorities were summoned to defendant's property was "solely because of calls . . . by Alcina Talbott," Def't's Sent. Memo. 6, is debunked not only by the stipulated factual basis attached to defendant's plea agreement, but also the statement of victim Jean Heidker (Ex. A pp. 1-2), and the statements of two San Bernardino County Deputies Sheriff who will be present at the sentencing hearing to be examined by the Court, or by the government at the Court's direction.

[3]    J.S. has informed the government that, in one altercation, defendant slashed the tires on Rick Kenney's truck, and, in return, Rick Kenney smashed the windshield on defendant's vehicle.  J.S. indicated that loud -- and bilateral -- arguments and altercations were typical of defendant's relationship with her husband at the time J.S. worked for defendant.

3

pants" in her relationship with Rick Kenney.  Deputy Thomas Schneider, who will also be present at defendant's sentencing, states that defendant is "the more dominant of the two," and is well "capable of taking care of herself."  These statements are consistent with police reports obtained by the government, and which the government will offer at defendant's sentencing hearing.  Those reports reflect that defendant and Rick Kenney often fought with each other, sometimes injuring others in the process.[4]

On at least two other occasions, defendant filed missing persons reports after Rick Kenney -- who appears to have had extramarital affairs -- left her.  When contacted by law enforcement, Rick Kenney would indicated that he did not desire to return to defendant.  This is of course contrary to -- and inconsistent with -- defendant's claims that her criminal activity results from "Stockholm Syndrome" or other behavioral health condition in which she is controlled by her husband and cannot escape him, or a fear that Rick Kenney would take away the children.  In fact, defendant's relationship with Rick Kenney -- which the government notes is intact-- has in the past resulted in the children being placed temporarily with defendant's parents, who have attempted to obtain custody of defendant's

---

[4]  On one occasion, defendant's son, then nine years old, was accidentally struck in the course of defendant trying to strike Rick Kenney.  The child received a bloody nose.  At the time, defendant, Rick Kenney, and their three children were living in a hotel room and attempted to bribe the hotel manager to lie to law enforcement about the nature of the incident. Defendant and Rick Kenney later "dropped [the child] off at the front gate to his Grandparent's [sic] house and watch [him] walk alone the last 100 meters through snow/ice to enter the residence."

children on a more permanent basis.

It is worth mentioning that defendant has put utilities, purchased cellular telephones, and signed lease agreements in her children's names, as well as using bank accounts in their names all to facilitate the fraud to which defendant has now been convicted.

The deputies' statements referenced above are also consistent with uncontested statements in the PSR.  On September 26, 1999, defendant was arrested for battering her parents.  (PSR ¶ 49.)  According to a crime report taken by the San Bernardino County Sheriff's Department, defendant and at least one of her children went to live with defendant's parents after defendant and her husband lost their home in Las Vegas, Nevada.  Defendant argued with her parents over numerous long distance phone calls she had made to her husband in Las Vegas.  (PSR ¶ 49.)  This resulted in defendant, on two separate occasions, brandishing a kitchen knife at her father, as well as slapping both of her parents.  (PSR ¶ 49.)

Virtually all of defendant's victims have informed the government (and now, through their victim statements attached as Exhibit A, the Court) that defendant yelled at, insulted, berated an abused them -- several to the point of either needing counseling and/or living in fear that defendant, who knew where they lived, would visit violence upon them or their loved ones.

4.    Harm Upon, and Risks to, Defendant's Victims

Defendant attempts to cast her crimes as simply "misleading the victims as to the condition or pedigree of the horses." (Def't's Sent. Memo. 6.)  This is not true.  Rather, defendant

defrauded nearly 90 victims of more than $200,000 by luring the victims with false Internet advertisements for the sale of imagined horses and contrived circumstances intended to make sale prices believable and speed the process of the sale.[5]  Using a number of aliases, including more than a dozen fictitious names, in additional to the identities of family members and her own children,[6] defendant systematically posted, maintained, and updated advertisements on a number of Internet websites, while simultaneously engaging in ongoing email and telephone communication, in her many aliases, to develop emotional connections between the victims and the horses they agreed to purchase sight unseen.

After receiving payment for a horse purchase, defendant would either (a) not provide a horse or a refund of the monies received from the victims; or (b) provide a horse completely and materially different from the horse the victim had agreed to purchase, often a horse that was seriously ill or badly injured, or that had been abused or neglected.  When contacted by victims to exercise the "money back" guarantees she promised, defendant would not answer or return telephone calls or email from victims

[5]  In the factual basis for her plea agreement, defendant has stipulated that, "[i]n response to expressions of interest in the purchase of horses described in her advertisements, defendant would, for the purpose of encouraging faster sales of the horses she advertised, falsely represent that others were interested in purchasing a particular horse, or that a particular horse was being sold at a discount because it needed to be sold quickly," for example because defendant was moving, getting divorced, etc. (Plea Agreement Factual Basis pp. 1-2.)

[6]  The government has agreed not to prosecute defendant for violating 18 U.S.C. § 1028A, a conviction for which would result in an additional two-year term of imprisonment to be served consecutively to any other sentence.  Plea Agreement ¶ 3(d).

and would falsely claim that the victims had breached sales contracts and would threaten to sue the victims.  (Plea Agreement Factual Basis p. 2.)  Defendant's scheme was, to say the least, quite a bit more complicated and intricate than defendant now claims in her sentencing memorandum, despite the stipulations she earlier made to avoid prosecution under 18 U.S.C. § 1028A.

Defendant also attempts to minimize the harms suffered by her victims and the risks of harm that were posed to the victims by defendant's criminal conduct.  (Def't's Sent. Memo. 6-7.) Specifically, defendant claims that the notion that defendant "put others at physical risk by selling them horses is . . . disingenuous and not credible."  (Def't's Sent. Memo. 6.)

The government anticipates that Jonatha Kalayjian (or her husband) and her now-adult daughter, M.K., described in paragraph 7 of Attachment 1 to defendant's Plea Agreement, will be present to address the Court at sentencing, consistent with the statement in the government's sentencing memorandum.  In addition, victim Ruth Schirmer describes the horses she bought from defendant for two of her teenage daughters.  (Exh. A pp. 3-4.)  One horse was lame in all four legs.  The other horse, "Bella," was wild and "dangerous," with a propensity for "spooking, rearing, biting, and kicking," which made "Bella" impossible to rehabilitate despite Ms. Schirmer's extensive efforts and expense to rehabilitate the mare.  "The poor mare had obviously been abused in the past.  Keep in mind, Trina Kenney sold this horse to a child!"  (Exh. A p. 3.)

Defendant, moreover, has stipulated, at paragraph 8 of Attachment 1 to the Plea Agreement, that victim Suzanne Bond's

professional horse trainer was thrown from the horse defendant sold Ms. Bond.  Suzanne Bond has indicated that she will be present at defendant's sentencing to address the Court.

Several of defendant's victims discuss their financial losses and other harms they suffered as a result of defendant's crimes in victim impact statements recently submitted to the government and the United States Probation Office and attached hereto as Exhibit A.  In general, these victims discuss that they lost money, time, and the ability to trust others, as well as having experienced guilt, shame, stress, emotional and psychological distress, and strained finances and relationships, among other things, as a result of defendant's criminal conduct.

Defendant's crimes did, therefore, place real victims at real risks and visited real harms upon them, in addition to the financial losses to which defendant has stipulated in the plea agreement.

5.   Defendant's Claims Concerning Her Childhood

Defendant claims that she was "spanked . . . during her childhood" and that her parents were "strict" and "religious." This is common to many people defendant's age.  It obviously does not excuse defendant's criminal conduct or warrant what amounts to a 16-level departure under the advisory guidelines.  The government has no way of testing the veracity of defendant's statements about alleged "abuse" by defendant's parents or sexual abuse claimed by defendant.  The government would add, however, that (1) the probation officer informed the government that defendant's claims were based solely on defendant's self-reporting, as appears to be the case with defendant's statements

8

to the psychiatrist hired by the defense; and (2) defendant has several fraud convictions that suggest little weight should be given to any uncorroborated statement made by her.

6. Conclusion

Defendant appears to have little respect for the law, as evidenced by her multiple prior convictions and custodial sentences, which have not deterred defendant from committing crimes of fraud as a way of life. A significant term of imprisonment is necessary to promote defendant's respect for the law, to deter her from committing future crimes, and to protect the public from her.

Significantly, although the PSR indicates that defendant has stated that she suffers "from depression, anxiety and what she believes is bipolar disorder," defendant has never attended counseling in any consistent manner, (PSR ¶ 66), despite her parents' ability and willingness to assist her in obtaining such treatment. According to the uncontested PSR, defendant is "in denial about her mental health issues" and does not "admit that she ha[s] a problem." (PSR ¶ 66.) A term of imprisonment will at least provide defendant "with needed . . . medical care [and] other correctional treatment" in a structured environment. 18 U.S.C. § 3553(a)(2)(D).