HILARY POTASHNER (Bar No. 167060)
Acting Federal Public Defender
ALYSSA D. BELL (Bar No. 27751)
(E-Mail: Alyssa_Bell@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
TRINA KENNEY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-10-969-GHK |
| Plaintiff, | |
| v. | ***EX PARTE* APPLICATION FOR EARLY TERMINATION OF SUPERVISED RELEASE** |
| TRINA KENNEY, | |
| Defendant. | |

Defendant Trina Kenney, by and through her attorney of record, Deputy Federal Public Defender Alyssa D. Bell, hereby applies *ex parte* for early termination of her supervised release. This motion is made pursuant to 18 U.S.C. §3583(e)(1). The motion is based on the attached memorandum of points and authorities, the attached declarations and exhibits, and all files and records of this case.

/

/

/

1

January 20, 2014

Respectfully submitted,

HILARY POTASHNER
Acting Federal Public Defender

*Alyssa D. Bell*
ALYSSA D. BELL
Deputy Federal Public Defender
Attorneys for Defendant

# **Table of Contents**

Memorandum of Points and Authorities ............................................................................. 1

    Statement of Facts ......................................................................................................... 2

    Argument ........................................................................................................................ 5

        1. This Court has broad discretion to terminate supervised release early based on the conduct of the defendant and the interests of justice. ........................... 5

        2. The Judicial Conference of the United States has adopted policies encouraging early termination in appropriate cases. ......................................... 6

        3. The Sentencing Commission also encourages early termination in appropriate cases. ............................................................................................... 8

        4. The Administrative Office of the United States Courts has concluded that early termination in appropriate cases can save a considerable amount of money without compromising public safety. ...................................................... 9

        5. Given the totality of the circumstances and the relevant factors, the Court should terminate Trina Kenney's supervised release ...................................... 10

Conclusioin .......................................................................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Johnson v. United States*,
    529 U.S. 694 (2000)......................................................................................15

*Pepper v. United States*,
    131 S.Ct. 1229 (2011)...................................................................................15

*United States v. Bahe*,
    201 F.3d 1124 (9th Cir. 2000) .....................................................................15

*United States v. Bainbridge*,
    746 F.3d 943 (9th Cir. 2014) ....................................................................5, 6

*United States v. Bauer*,
    2012 WL 1259251 (N.D. Cal. 2012)........................................................5, 8

*United States v. Carter*,
    2013 WL 2255875 (N.D. Cal. 2013)........................................................5, 8

*United States v. Emmett*,
    749 F.3d 817 (9th Cir. 2014) ....................................................................5, 6

*United States v. Grossi*,
    2011 WL 704364 (N.D. Cal. 2011)..........................................................5, 8

*United States v. Jackson*,
    189 F.3d 820 (9th Cir. 1999) .......................................................................15

*United States v. Johnson*,
    529 U.S. 53 (2000).......................................................................................15

*United States v. Lussier*,
    104 F.3d 32 (2nd Cir. 1997) ...................................................................5, 6, 8

*United States v. McKay*,
    352 F.Supp.2d 359 (E.D.N.Y. 2005)........................................................5, 8

*United States v. Miqbel*,
    444 F.3d 1173 (9th Cir. 2006) .....................................................................11

*United States v. Weintraub*,
   371 F.Supp.2d 164 (D. Conn. 2005) ...................................................................5, 8

**Federal Statutes**

18 U.S.C. § 1341, 2(b) .......................................................................................8

18 U.S.C. § 3553(a)(1).....................................................................................5, 11

18 U.S.C. § 3559(a) ..........................................................................................8

18 U.S.C. § 3583(e)(1).................................................................................*passim*

28 U.S.C. § 994(h) ...........................................................................................7

Judicial Conference Committee on Criminal Law ................................................10

**Sentencing Guideline**

U.S.S.G. §5D1.2 ...............................................................................................8

**Other Authorities**

FEDERAL PROBATION JOURNAL, *Early Termination of Supervision: No Compromise to Community Safety* (September 2013) ............................................................9, 10

THIRD BRANCH NEWS, *Early Termination of Supervision Cost-Effective and Safe* (September 24, 2013) ...............................................................................9, 10

United States Courts, GUIDE TO JUDICIARY POLICY, Volume 8, Part E ....................6

United States Courts, GUIDE TO JUDICIARY POLICY, Volume 8E, Chapter 6 ............7

iii

**Memorandum of Points and Authorities**

**Introduction**

Trina Kenney pled guilty to mail fraud and was sentenced, on April 13, 2011, to 41 months in custody and three years of supervised release.  She began her term of supervised release on May 31, 2013, and her supervised release is due to expire on May 30, 2016.  To date, she has completed in excess of 19 months of her supervised release and her performance has been exemplary: she has had no violations of her supervised release, and no disciplinary incidents.

Since reentering the community, Ms. Kenney has become a productive member of society.  She is steadily employed as a personal assistant, she is the primary caregiver for her three minor children, she cares part-time for her elderly grandmother, and she volunteers regularly at her church.  However, she cannot realize her ultimate career ambition -- to become a real estate agent -- while on supervised release, because she is not eligible to obtain her real estate license while under the supervision of the criminal justice system.  A career in real estate would allow Ms. Kenney to grow professionally, and to earn much-needed income for her family, while maintaining the flexibility necessary to care for her children and grandmother.

This Court has discretion to terminate Ms. Kenney's supervised release early based on her conduct and the interests of justice.  For the reasons stated herein, Ms. Kenney respectfully requests early termination of her supervised release.

/

/

/

/

/

1

**Statement of Facts**

During the more than 19 months that Ms. Kenney has been under supervision, she has demonstrated her commitment to rehabilitation, to professional and personal development, and to staying a law-abiding course in the future.

Ms. Kenney has undergone extensive psychological treatment since her offense occurred, participating in hundreds of hours of counseling since her arrest. First, she completed six months of pretrial psychiatric counseling. *See* Ex. D (Declaration of Trina Kenney ("Kenney Dec."), ¶ 13). While in custody, she completed the RDAP program, which contains a substantial counseling component, as well as six months of counseling as part of the after-care component of RDAP. *Id.* Following her release from incarceration, per the conditions of her supervised release, Ms. Kenney completed six months of weekly private counseling. *Id.* Following modification of her supervised release conditions,[1] Ms. Kenney began completing at-home workbooks at the direction of her Probation Officer at the time, Dena Vasquez. *Id.*[2]

---

[1] On April 30, 2014, USPO Dena Vasquez requested a calendar date before the Court. Dkt. # 39. The petition alleged that Ms. Kenney had been involved, together with her husband and children, in the sale of puppies with illnesses. *Id.* The probation office requested that Ms. Kenney be required to pay an increased level of restitution, in light of alleged monies received from the sale of puppies. *Id.* Ms. Kenney vehemently denied any wrongdoing and maintained that she was financially unable to pay increased restitution, and the matter was set for an evidentiary hearing. Dkt. # 43. Following extensive negotiations among the parties, Ms. Kenney provided the probation office with a sworn declaration detailing her finances, and the probation office abandoned its request for additional restitution. *Id.* ("Allegation contained in the May 6, 2014 petition is withdrawn at this time."). Rather than waste the Court's resources with a time-consuming evidentiary hearing, in light of the probation office's changed position, the parties agreed to a modification of the terms of supervised release that included, *inter alia*, an expansive search condition of Ms. Kenney's residence, and her agreement to participate in a particular course of life-skills based therapy, as directed by the probation office. Dkts. # 47, 49, & 50. Ms. Kenney was, and remains, eager to rehabilitate herself and has complied fully with all requirements of the therapy

Ms. Kenney's extensive and considerable rehabilitation have provided her with the tools to grow both personally and professionally, becoming an engaged parent and a dedicated employee. Ms. Kenney lives with her husband, Rick Kenney, and their three children: a son, age 16, and two daughters, ages 14 and 6. *Id.*, ¶ 3. She works from home, so that she may be present and available to her children whenever they are not in school or engaged in an extra-curricular activity. *Id.*, ¶ 6. Ms. Kenney is principally responsible for caring for her children: she takes them to school, enrolls them in enrichment activities, and schedules and takes them to doctor's appointments. *Id.* She helps her children with their homework, she attends her son's football games and her older daughter's cheerleading meets, and she volunteers for both teams whenever she is needed. *Id.* In addition to her childcare responsibilities, Ms. Kenney also cares for her elderly grandmother, visiting her several times a week, taking her to doctor's appointments, and running errands for her. *Id.*, ¶ 7. Professionally, Ms. Kenney has steady employment, working as a personal assistant for approximately 30 hours per week. *Id.*, ¶ 4. She works from home so that she may be fully available to her children when they are not at school. *Id.*

Ms. Kenney is an active member of her church community. She attends services with her family every Sunday and regularly volunteers at church functions. *Id.*, ¶ 8. In addition, she volunteers for her husband's non-profit organization, Trinity House Intl.,[3]

---

program. No evidence of wrongdoing has been uncovered, or even alleged, pursuant to the search condition. For this reason, the parties' consensual modification should not be held to weigh against early termination.

[2] To date, Ms. Kenney has completed all three workbooks assigned to her. She requested additional workbooks, but none have thus far been provided.

[3] Trinity House International is a non-profit organization that Ms. Kenney's husband, Rick Kenney, founded after Ms. Kenney's release from incarceration. As Mr. and Ms. Kenney explain in their letters to the Court in support of the instant motion, Ms. Kenney's time in custody exposed her to the depth of suffering that exists in this world and inspired her to dedicate herself to service, and to her faith. Ex. A (Trina Kenney Letter to the Court); Ex. C (Rick Kenney Letter to the Court). Trinity House works

3

conducting outreach activities.  *Id.*, ¶ 12.  Sometimes, however, her supervised release impedes her ability to engage fully in her religious community.  For example, Ms. Kenney was recently unable to attend a volunteer activity donating clothing and food to Destiny House, a safe house in Nevada for women who have been prostituted and abused, because the event was scheduled with too little notice for her to request and obtain approval for out-of-district travel, as required by her supervised release conditions.  *Id.*, ¶ 9.

Consistent with her dedication to rehabilitation, Ms. Kenney has begun to plan a career that will allow her to grow professionally:  she would like to become a real estate agent.  *Id.*, ¶ 5.  Working in real estate would not only provide Ms. Kenney with meaningful employment, it would also provide much-needed income for her family while giving her the flexibility to continue caring for her children and grandmother.  *Id.* An increase in income would make a considerable difference for Ms. Kenney and her family, especially as two of her children near the age where they will attend college. Ms. Kenney has already begun studying for the examination she must take to obtain her real estate license.  *Id.*  A second step awaits her following successful passage of the exam, however:  the Bureau of Real Estate must review and approve her candidacy.  *Id.* Notably, the Bureau of Real Estate will *not* approve her application while she is on supervised release, but will, conversely, view early termination of supervised release favorably as evidence of rehabilitation.  *Id.*; Ex. B (Declaration of Kim Sanders ("Sanders Dec."), ¶¶ 3-4).

---

with volunteers to feed the homeless, conducts clothing drives for the needy, and strives to alleviate poverty through dedication to the Christian church.  *Id.*; see also http://www.trinityhouseintl.org/.

## Argument

**1.    This Court Has Broad Discretion To Terminate Supervised Release Early Based On The Conduct Of The Defendant And The Interest Of Justice.**

After a defendant has served at least one year on supervised release, the Court may terminate supervised release if, after considering the factors set forth in section 18 U.S.C. §3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7), "it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice[.]"  18 U.S.C. §3583(e)(1).  This language "gives district courts broad discretion in determining whether to grant a motion to terminate supervised release."  *United States v. Emmett*, 749 F.3d 817, 819 (9th Cir. 2014).  "The expansive phrases 'conduct of the defendant' and 'interest of justice' make clear that a district court enjoys discretion to consider a wide range of circumstances when determining whether to grant early termination."  *Id*.  The Court must explain its decision for granting or denying a motion for early termination sufficiently to allow for meaningful appellate review and to promote the perception of fairness.  *Id*. at 820-22.

In the past, some district courts have misread dicta in *United States v. Lussier*, 104 F.3d 32, 36 (2nd Cir. 1997) – a case dealing with modification of supervised release conditions under §3583(e)(2) rather than early termination under §3583(e)(1) – to mean that early termination should be granted rarely and only upon a showing of "changed circumstances" like "exceptionally good behavior."[4]  In *United States v. Bainbridge*, 746 F.3d 943, 948-49 & n.3 (9th Cir. 2014), however, the Ninth Circuit held that *Lussier* does not require "changed circumstances" for the modification of

---

[4]    *See e.g. United States v. Weintraub*, 371 F.Supp.2d 164, 166-67 (D. Conn. 2005); *United States v. McKay*, 352 F.Supp.2d 359, 360-61 (E.D.N.Y. 2005); *United States v. Grossi*, 2011 WL 704364, *2 (N.D. Cal. 2011); *United States v. Bauer*, 2012 WL 1259251, *1-2 (N.D. Cal. 2012); *United States v. Carter*, 2013 WL 2255875, *1-2 (N.D. Cal. 2013).

5

supervised-release conditions under §3583(e)(2).  It follows that "changed circumstances" are also not a prerequisite for early termination of supervised release.  Therefore, district court cases that are based on an erroneous interpretation of *Lussier* are, likewise, incorrect statements of the law.  In other words, changed circumstances may provide a *sufficient* basis to terminate supervised release early, but they are not *necessary* for such relief.  *Id*. at 947-50.[5]  Likewise, although early termination may be appropriate where there are unusual or extraordinary circumstances, such circumstances are not *required*.

Because the *only* criteria established by §3583(e)(1) are the conduct of the defendant and the interest of justice, this Court would err if it made changed, unusual, or extraordinary circumstances a prerequisite for granting early termination.  *Cf. Emmett*, 749 F.3d at 819 (court would err by categorically requiring a defendant seeking early termination to demonstrate undue hardship).  Moreover, as discussed in the following sections, such a standard would conflict with policies adopted by the Judicial Conference of the United States and the Sentencing Commission that encourage early termination in appropriate cases.

**2.      The Judicial Conference Of The United States Has Adopted Policies Encouraging Early Termination In Appropriate Cases.**

The Judicial Conference of the United States encourages the liberal use of early termination through the manual supplied to probation officers by the Administrative Office of the United States Courts.  *See* Administrative Office of the United States Courts, GUIDE TO JUDICIARY POLICY, Volume 8, Part E, *Supervision of Federal*

---

[5]   In any event, because §3583(e)(1) requires the Court to consider the conduct of the defendant while on supervised release, it will necessarily consider "changed circumstances" that were not (and could not have been) considered at the time of the original sentencing.

6

*Offenders (Monograph 109)*, §380.10 (2012), available at http://jnet.ao.dcn/policy-guidance/guide-judiciary-policy/volume-8-probation-and-pretrial-services/part-e-supervision-federal-offenders-monograph-109 (last visited June 19, 2014); Appendix 3-5.[6]  That manual instructs probation officers to "consider the suitability of early termination for offenders *as soon as they are statutorily eligible*" using certain criteria (which are discussed below).  *Id.*, §380.10(b) (emphasis added); Appendix 3-4.  In fact, probation officers must discuss early-termination assessments with their supervisors as part of the periodic evaluation process.  *Id.*, §380.10(f); Appendix 5.

During the first 18 months of supervision, probation officers must consider the appropriateness of early termination based on the defendant's overall progress and "an evaluation of all the circumstances in the individual case."  *Id.*, §380.10(d); Appendix 4.  But at subsequent assessments, "there is a **presumption in favor of recommending early termination**" in many cases.  *Id.*, §380.10(e) (emphasis added); Appendix 4-5.  Specifically, the presumption applies to defendants who have been under supervision for at least 18 months and: "(a) are not career violent and/or drug offenders (as described in 28 U.S.C. §994(h)), sex offenders, or terrorists; (b) present no identified risk to the public or victims, and (c) are free from any moderate (*see*: Guide, Vol 8E, §620.40.20) or high (*see*: §620.40.30) severity violations[.]"  *Id.*, §380.10(e)(1); Appendix 4.[7]  And after 42 months of supervision, the presumption applies if just (a) and (c) are satisfied.  *Id.*, §380.10(e)(2); Appendix 5.

---

[6]  A copy of this section of the manual is included in the attached appendix.

[7]  Thus the presumption applies even if the defendant has low-severity violations.  "Low severity violations are minor and nonrecurring[,]" and include all non-recurring technical violations, minor traffic infractions (unless a violation of a special condition), and minor-offense conduct, unless an actual arrest occurs or such behavior is part of a pattern of noncompliance.  *See* Administrative Office of the United States Courts, GUIDE TO JUDICIARY POLICY, Volume 8E, Chapter 6, *Managing Noncompliant Behavior*, §620.40.10 (2014), available at http://jnet.ao.dcn/sites/default/files/pdf/Vol8E_Ch6.pdf (last visited June 19, 2014).

Notably, these Judicial Conference guidelines say nothing about changed, unusual, or extraordinary circumstances being required for early termination.  On the contrary, they establish that successfully completing a significant portion of the supervised-release term can provide good cause to terminate supervision early.  Indeed, the Judicial Conference could not have adopted the above-described *presumptions* in favor of early termination if this were not the case.  Therefore, to the extent that some district court cases rooted in the misreading of *Lussier* suggest otherwise, [8] they are clearly wrong.

**3.      The Sentencing Commission Also Encourages Early Termination In Appropriate Cases.**

Like the Judicial Conference, the Sentencing Commission also "encourage[s]" courts to exercise their early-termination authority in appropriate cases.  U.S.S.G. §5D1.2, Application Note 5.  In fact, its guidelines note that "[t]he prospect of exercising this authority is a factor the court may wish to consider in determining the length of a term of supervised release." *Id*.  This instruction is particularly important here given that Ms. Kenney, like the vast majority of criminal defendants in the Central District of California, received the maximum term of supervised release when she was sentenced in 2011.  She pled guilty to a Class C felony. *See* 18 U.S.C. §1341, 2(b) (establishing maximum sentence of 20 years); 18 U.S.C. §3559(a) (offense with a maximum sentence of less than 25 years but at least 10 years is Class C felony; offense with a maximum sentence of less than 10 years but at least 5 years is Class D felony).  The statutorily-authorized term of supervised release for a Class C or D felony is "not more than three years;" there is no minimum term.  18 U.S.C. §3583(b)(2).  And the Sentencing Guidelines recommend a supervised-release range of "[a]t least one year

---

[8]    *See e.g. Weintraub*, 371 F.Supp.2d at 166-67; *McKay*, 352 F.Supp.2d at 361; *Grossi*, 2011 WL 704364, *2; *Bauer*, 2012 WL 1259251, *2; *Carter*, 2013 WL 2255875, *2.

but not more than three years for a defendant convicted of a Class C or D felony." U.S.S.G. §5D1.2(a)(2).

Nevertheless, in accord with the standard practice of this district, the Court imposed the maximum term of three years when sentencing Ms. Kenney, despite the low-end advisory term of one year under the Guidelines and the lack of a statutory minimum. Under such circumstances, early termination acts as a safety valve of sorts where, as here, a defendant's successful performance while on supervised release demonstrates that she doesn't merit the maximum supervised-release term after all. In other words, where the Court starts off by imposing the maximum term and a defendant performs well for a year or more, it can decide that, in hindsight, imposition of the maximum term was not necessary for that defendant and therefore reduce or terminate the supervised-release term accordingly.

**4.    The Administrative Office Of The United States Courts Has Concluded That Early Termination In Appropriate Cases Can Save A Considerable Amount Of Money Without Compromising Public Safety.**

A recent study by the Administrative Office of the United States Court concluded that early termination in appropriate cases can save the courts significant resources without compromising public safety. *See* Baber & Johnson, FEDERAL PROBATION JOURNAL, *Early Termination of Supervision: No Compromise to Community Safety* (September 2013) (hereinafter "*No Compromise to Community Safety*"), available at http://www.uscourts.gov/viewer.aspx?doc=/uscourts/FederalCourts/PPS/Fedprob/2013-09/no-compromise.html (last visited June 19, 2014); United States Courts, THE THIRD BRANCH NEWS, *Early Termination of Supervision Cost-Effective and Safe* (September 24, 2013) (hereinafter "*Cost-Effective and Safe*"), available at http://news.uscourts.gov/early-termination-supervision-cost-effective-and-safe (last

visited June 19, 2014); Appendix 6-16.[9]  After describing how the Judicial Conference endorsed the policies and presumptions discussed above, that study concluded that "offenders granted early termination under the current policies pose no greater danger to the community than offenders who serve a full term of supervision." *No Compromise to Community Safety* at 1, 7; Appendix 6, 12.  "Perhaps more significantly, the results of the study indicate that while the early termination policy does not, as currently administered, compromise community safety, the attributable cost avoidance is significant." *Id*. at 9; Appendix 14.  This has led Judge Robert Holmes Bell, chair of the Judicial Conference Committee on Criminal Law, to conclude that early termination "promotes justice, conserves resources, and protects the public[.]" *Cost-Effective and Safe* at 1; Appendix 15.  Nevertheless, there is "considerable district-to-district variation, with early termination rates ranging from 46 percent of successful closings in one district to zero in another." *No Compromise to Community Safety* at 2; Appendix 7.[10]  This disparity is likely due in large part to the misunderstanding about the proper standard for judging early-termination motions discussed above in §1.

**5.     Given The Totality Of The Circumstances And The Relevant Factors, The Court Should Terminate Ms. Kenney's Supervised Release.**

In this case, early termination is justified in light of both the applicable statutory factors and the Judicial Conference's guidelines.

---

[9]  Copies of these documents are included in the attached appendix.

[10]  The nationwide early-termination rate has been about 18-19% in recent years.  *Id*.

10

*The Statutory Factors*

The Court must consider the following statutory factors in deciding whether early termination is warranted here:

- the nature and circumstances of the offense and the history and characteristics of the defendant;

- the need for the sentence imposed to afford adequate deterrence to criminal conduct;

- the need for the sentence imposed to protect the public from further crimes of the defendant;

- the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

- the applicable Sentencing Guidelines;

- any pertinent policy statement issued by the Sentencing Commission;

- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

- the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. §3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), (a)(7); 18 U.S.C. §3583(e)(1).[11]

These factors justify early termination in this case. Ms. Kenney's crime of conviction, mail fraud, was non-violent in nature, and occurred at a time when Ms. Kenney had never received treatment for her lifelong struggle with depression and anxiety. Dkt #16 (PSR), ¶ 66. Since her arrest, she began an intensive course of

---

[11] Notably, the Court cannot consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (§3553(a)(2)(A)). *See United States v. Miqbel*, 444 F.3d 1173, 1181-82 (9th Cir. 2006).

11

therapy that continues to this day.  Kenney Dec., ¶ 13.  She has now graduated from weekly private counseling sessions to a self-directed life skills program, for which she completes workbooks at home.  *Id.*  To date she has completed all of the workbooks provided to her.  *Id.*

Ms. Kenney's successful rehabilitation is evidenced in her professional and personal development.  There is no longer a need for the public to be protected from "further crimes," since she has not committed even a minor or technical violation while on supervised release.  To the contrary, she is a productive and engaged member of her community by any measure.  She maintains thirty hours a week of employment as a personal assistant while also providing childcare to her children ages 6, 14, and 16.  *Id.*, ¶ 3.  She is involved in her children's lives at school and at home, making sure that they do their homework, that they are enrolled in enrichment activities, and that they attend their sports practices.  *Id.*, ¶ 6.  When she is not working or caring for her children, she cares for her grandmother.  *Id.*, ¶ 7.

Ms. Kenney's faith also plays a key role in her life.  She regularly attends church, and offers her free time volunteering at church activities and for her husband's nonprofit organization.  *Id.*, ¶¶ 8, 12.  The fact that Ms. Kenney has a supportive moral community in her life lessens the need, in this case, for further correctional treatment or further supervision.

Additionally, Ms. Kenney has been making regular payments of $25 on her restitution amount of $272,609.50.  Additional time on supervised release would not make a significant difference on the outstanding restitution[12] and does not justify keeping Ms. Kenney on supervised release.  Moreover, if Ms. Kenney is successful in

---

[12] Ms. Kenney's supervised release is currently scheduled to terminate in 17 months, which would amount to an additional $450 at the rate of $25 per month under the supervised release conditions.

obtaining her real estate license, her increased income would likely allow her to make restitution payments greater than the $25 per month she is paying now.

Moreover, the Sentencing Guidelines recommend one to three years of supervised release.  Ms. Kenney has already served 19 months of supervised release, and early termination would be well within the Guidelines range.

Ms. Kenney has dreams of a career in real estate, and has taken the first steps towards getting her license. *Id.*, ¶ 5.  A career in real estate would allow her to continue to work flexible hours and to maintain her childcare responsibilities, while also providing her family with the extra income they will no doubt require as her children complete high school and head to college.  *Id.*  As noted, however, Ms. Kenney cannot obtain her real estate license while on supervised release.  Sanders Dec., ¶¶ 3-4.

For these reasons, the statutory factors weigh in favor of early termination.

*The Judicial Conference Guidelines*

The conclusion that the statutory factors warrant early termination is buttressed by the Judicial Conference's guidelines.  Most important, the **presumption** in favor of early termination applies here because Ms. Kenney has been under supervision for at least 18 months; she is not a career violent and/or drug offender, a sex offender, or a terrorist; she presents no identified risk to victims or the public; and she has not violated her supervised-release conditions. *Monograph 109*, §380.10(e)(1); Appendix 4.  Moreover, this presumption is consistent with the Judicial Conference's criteria for assessing whether a statutorily-eligible defendant is an appropriate candidate for early termination:

- stable community reintegration (e.g., residence, family, and employment);
- progressive strides toward supervision objectives and in compliance with all conditions of supervision;

13

- no aggravated role in the offense of conviction, particularly large drug or fraud offenses;
- no history of violence (e.g., sexually assaultive, predatory behavior, or domestic violence);
- no recent arrests or convictions (including unresolved pending charges) or ongoing, uninterrupted patterns of criminal conduct;
- no recent evidence of alcohol or drug abuse;
- no recent psychiatric episodes;
- no identifiable risk to the safety of any identifiable victim; and
- no identifiable risk to public safety based on the Risk Prediction Index.

*Id.*, §380.10(b); Appendix 3-4.  Notably, with the possible exception of identified risks to community safety,[13] "the failure to meet other criteria listed should not automatically exclude an offender from further consideration."  *Id.*, §380.10(d); Appendix 4.  In fact, even the existence of an outstanding financial penalty does not automatically adversely affect early-termination eligibility as long as the offender has been paying in accord with his payment plan.  *Id.*, §380.10(c); Appendix 4.

The above-listed criteria support the presumption of early termination in this case.  As discussed above, Ms. Kenney has successfully reintegrated into the community, and has no need of additional supervision.  As described in detail *supra*, she has a stable residence, employment, and family.  She has made progressive strides towards the objectives of supervision, including by completing extensive counseling

---

[13]  The guidelines reflect that such risks preclude a recommendation of early termination within the first 18 months of supervision and preclude the presumption that might otherwise come into play after 18 months, but they do not preclude the presumption that may apply after 42 months on supervision.  *Id.*, §380.10(d) & (e); Appendix 4-5.

and maintaining stable employment.  She did not play an aggravated role in the offense of conviction.  She has no history of violence, no recent arrest, no recent use of alcohol or drugs, no recent psychiatric episodes, and poses no identifiable risk to any victim nor to the community.

In short, Ms. Kenney is someone for whom supervised release has served its intended purpose:  to transition from incarceration to the community.  She has transitioned successfully and has no further need of supervision.

*Conclusion*

The Court should keep in mind that supervised release is not designed or permitted to serve a punitive function.  *See United States v. Bahe*, 201 F.3d 1124, 1133 (9th Cir. 2000); *United States v. Jackson*, 189 F.3d 820, 823 (9th Cir. 1999).  Rather, "Congress intended supervised release to assist individuals in their transition to community life.  Supervised release fulfils rehabilitative ends, distinct from those served by incarceration."  *United States v. Johnson*, 529 U.S. 53, 59 (2000); *see also Pepper v. United States*, 131 S.Ct. 1229, 1248 n.15 (2011) (citing *Johnson*); *Johnson v. United States*, 529 U.S. 694, 708-09 (2000) ("The congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty").  The above-described facts establish that Ms. Kenney has successfully transitioned from incarceration to community life.  Because the goals of supervised release have been satisfied, early termination "is warranted by the conduct of the defendant released and the interest of justice."  18 U.S.C. §3583(e)(1).

January 20, 2014                              Respectfully submitted,

                                              HILARY POTASHNER
                                              Acting Federal Public Defender
                                              */s/Alyssa D. Bell*
                                              ALYSSA D. BELL
                                              Deputy Federal Public Defender

15

## Declaration of Alyssa D. Bell

I, Alyssa D. Bell, hereby declare and state as follows:

1.  I am a Deputy Federal Public Defender in the Central District of California.  I represent defendant Trina Kenney in this case.

2.  I have conferred with the United States Probation Officer assigned to supervise Ms. Kenney regarding the substance of this *ex parte* application and the relief sought herein.

3.  The United States Probation Office opposes Ms. Kenney's request for early termination at this time.

4.  I have also conferred with the Assistant United States Attorney assigned to this case, James Bowman.

5.  The United States Attorney's Office opposes the relief sought in this application.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 20, 2015, at Los Angeles, California.

>     */s/Alyssa D. Bell*
>     ALYSSA D. BELL
>     Deputy Federal Public Defender

16

# Appendix

# Guide to Judiciary Policy

Vol 8: Probation and Pretrial Services
Pt E: Supervision of Federal Offenders (Monograph 109)

## Ch 3: Supervision Assessment and Planning Process

§ 310 Overview
  § 310.10 Principles
  § 310.20 Process

§ 320 Initial Assessment
  § 320.10 Timing and Duration
  § 320.20 Investigation Activities
  § 320.30 Gather and Review Written Background Information
  § 320.40 Interview the Offender
  § 320.50 Inspect Residence, Visit Work Sites, and Interview Collateral Sources
  § 320.60 Supervision of Inmates on Authorized Release

§ 330 Reentry Planning Activities for Incarcerated Offenders
  § 330.10 Investigate the Release Plan
  § 330.20 Approve, Modify, or Disapprove the Release Plan
  § 330.30 Assist with Reentry Services for Prisoners in Prerelease Custody

§ 340 Supervision Planning Activities
  § 340.10 Conduct an Orientation Interview with the Offender
  § 340.20 Conduct a Home Inspection
  § 340.30 Continue to Develop Collateral Sources

§ 350 Assessing Risks, Risk-Related Needs, and Strengths
  § 350.10 Risks and Risk-Related Needs
  § 350.20 Strengths
  § 350.30 Follow-Up Interview with the Offender

§ 360 Preparing the Initial Supervision Plan
  § 360.10 Record the Results of the Assessment
  § 360.20 Prioritize Supervision Issues
  § 360.30 Develop Targeted Offender Supervision Objectives
  § 360.40 Identify Obstacles to Achieving Objectives
  § 360.50 Develop Supervision Strategies
  § 360.60 Finalize the Plan

*Last revised (Transmittal 08-016) June 20, 2012*

Appendix - Page 1

§ 370 Supervision Plan Implementation and Evaluation
        § 370.10 Implementation
        § 370.20 Evaluation

§ 375 Transfer of Supervision
        § 375.10 Definitions
        § 375.20 Transfer Decision
        § 375.30 Transfer Procedure
        § 375.40 Officer Responsibility When Jurisdiction Is Not Transferred
        § 375.50 Re-transferring Supervision
        § 375.60 Transfer in Special Cases
        § 375.70 Transfer of Jurisdiction in Treaty Transfer Cases

§ 380 The Transition Off Supervision
        § 380.10 Early Termination
        § 380.20 Case Closing Activities

Appendices

Appx 3A Procedures for Infractions and Class B or C Misdemeanors, Offenders
        Received as Inactive, and Courtesy Supervision Cases
Appx 3B Activity List

---

## § 310 Overview

### § 310.10 Principles

(a)     The purpose of supervision planning is to create an evolving, individualized, outcome-based plan of action to monitor compliance with the conditions of release and intervene as necessary to address any identified risks. The goal in all cases is the successful completion of the term of supervision, during which the offender commits no new crimes; is held accountable for victim, family, community, and other court-ordered responsibilities; and prepares for continued success through improvements in his or her conduct and condition.

(b)     Not all offenders require the same level of supervision to reach this goal. It is the officer's job to distinguish among them and to implement supervision strategies that are appropriately matched with the offender's risks, needs, and strengths and neither more nor less intrusive than necessary to facilitate supervision goals. This is key to providing effective supervision that is individualized, proportional, and purposeful. It is also

(e)     Because many treaty transferees are immediately released to a term of supervised release, jurisdiction in these cases should be established as soon as possible in case court action or a warrant becomes necessary.

(f)     Some treaty transferees will be released to a term of supervised release after an additional period of incarceration in the United States. These cases also should be docketed and filed so that jurisdiction will be established awaiting the transferee's release, analogous to the supervised release cases sentenced by the district court.

(g)     For information about the treaty transfer post-sentence report prepared for the Parole Commission in these cases, **see:** Guide, Vol 8, Appx 1D.

## § 380 The Transition Off Supervision

The transition out of the criminal justice system is a process, not an event. It is the culmination of a series of transitions that began when the offender was first arrested for the crime and is one of the most critical for achieving long-term public safety beyond the term of supervision. Transition off supervision is implemented throughout the supervision period by providing offenders with the tools — and connecting them to the social services — they require to function under decreasing levels of control.

## § 380.10 Early Termination

(a)     Under 18 U.S.C. §§ 3564(c) and 3583(e)(1), the court may terminate terms of probation in misdemeanor cases at any time and terms of supervised release or probation in felony cases after the expiration of one year of supervision if satisfied that such action is warranted by the conduct of an offender and is in the interest of justice.  (**Note:**  Early termination of parole cases is governed by the United States Parole Commission Rules and Procedures Manual, section 2.43.)

(b)     Officers should consider the suitability of early termination for offenders as soon as they are statutorily eligible. The general criteria for assessing whether a statutorily eligible offender should be recommended to the court as an appropriate candidate for early termination are as follows:

      (1)     Stable community reintegration (e.g., residence, family, and employment);

      (2)     Progressive strides toward supervision objectives and in compliance with all conditions of supervision;

(3)     No aggravated role in the offense of conviction, particularly large drug or fraud offenses;

(4)     No history of violence (e.g., sexually assaultive, predatory behavior, or domestic violence);

(5)     No recent arrests or convictions (including unresolved pending charges) or ongoing, uninterrupted patterns of criminal conduct;

(6)     No recent evidence of alcohol or drug abuse;

(7)     No recent psychiatric episodes;

(8)     No identifiable risk to the safety of any identifiable victim; and

(9)     No identifiable risk to public safety based on the Risk Prediction Index.

(c)     The existence of an outstanding financial penalty *per se* does not adversely affect early termination eligibility as long as the offender has been paying in accordance with the payment plan.

(d)     During the first 18 months of supervision, the appropriateness of early termination should be based on the offender's overall progress in meeting supervision objectives and should include an evaluation of all the circumstances in the individual case. Offenders with identified risks to community safety should not be recommended for early termination. However, the failure to meet other criteria listed should not automatically exclude an offender from further consideration.

(e)     At subsequent assessments, there is a presumption in favor of recommending early termination for probationers and supervised releasees:

(1)     Who have been under supervision for at least 18 months and

(a)     are not career violent and/or drug offenders (as described in 28 U.S.C. § 994(h)), sex offenders, or terrorists,

(B)     present no identified risk to the public or victims, and

(C)     are free from any moderate (**see:** Guide, Vol 8E, § 620.40.20) or high (**see:** § 620.40.30) severity violations; and

(2)     Who have been under supervision for at least 42 months and

      (a)     are not career violent and/or drug offenders (as described in 28 U.S.C. § 994(h)), sex offenders, or terrorists, and

      (B)     are free from any moderate (**see:** Guide, Vol 8E, § 620.40.20) or high (**see:** § 620.40.30) severity violations.

(f)     Early termination assessments should be discussed with the supervisor as part of the periodic evaluation process. A request to the court for early termination consideration should include a summary of the offender's adjustment under supervision, along with justification for a request for early termination supported by the chronological record. The request should also include options for the court to revisit the offender's early termination at a later time.

(g)     Should the court order the termination of an offender's supervision, the case should be statistically closed immediately.

## § 380.20 Case Closing Activities

(a)     For cases under active supervision, officers are to undertake the following case closing activities during the last six months of the supervision term.

      (1)     *For offenders who continue to present current risks and needs* (as documented on the last case plan), interview the offender and his or her family or significant others to discuss future plans, particularly as they relate to the need for ongoing services to address risks and needs, and refer the offender to appropriate service providers in the community for assistance with substance abuse or mental health counseling and support, medication, housing, and other basic needs.

      (2)     *For offenders with outstanding monetary penalties*, notify the Financial Litigation Unit of the United States attorney's office of the pending termination of supervision for offenders who will have outstanding fine and restitution balances and provide the unit with all available information on offender resources and ability to pay.

      (3)     *For all offenders*,

            (A)     Assess whether the offender is subject to any newly enacted or expanded statutory requirements and, if so, implement or

Volume 77 Number 2



Home

# Early Termination of Supervision: No Compromise to Community Safety

*Laura M. Baber*
*James L. Johnson*
*Office of Probation and Pretrial Services*
*Administrative Office of the U.S. Courts*

Policy Background
Methodology
Description of Study Population
Findings
Discussion

**UNDER 18 U.S.C. §§ 3564(c)** and 3583(e)(1), the court may terminate terms of probation in misdemeanor cases at any time and terms of supervised release or probation in felony cases after the expiration of one year of supervision, if satisfied that such action is warranted by the conduct of an offender and is in the interest of justice. As such, early termination is a practice that holds promise as a positive incentive for persons under supervision and as a measure to contain costs in the judiciary without compromising the mission of public safety.

## Policy Background

Over the past decade, the Judicial Conference has endorsed policies that encourage probation offices to terminate statutorily-eligible offenders from supervision early as a means to limit projected workload growth in probation and pretrial services, and has continued to fine-tune those policies as evidence suggests is appropriate. In 2003, the Judicial Conference approved a policy that encouraged probation officers to seek early termination as soon as offenders were statutorily eligible if the offender had satisfied the conditions of supervision, had successfully reintegrated into the community, and did not pose a foreseeable risk to public safety generally or to any individual third party. In 2005, the Judicial Conference approved policy changes that allowed offenders with outstanding balances on fines and restitutions to be considered for early termination as long as they were otherwise suitable and in compliance with their payment schedule. In 2005, the Committee revisited the early termination policy, recommending provisions modeled after United States Parole Commission regulations. Specifically, the Conference approved creating a presumption in favor of early termination for non-career and non-violent offenders who 1) have been under supervision for at least 18 months, present no identified risk to the public or victims, and are free from any moderate- or high-severity violations; or 2) have been under supervision for at least 42 months and are free from any moderate- or high-severity violations. These policies remain in effect today.

Policies on early termination have clearly influenced practices in the courts. The number of early terminations granted by the courts increased 50 percent in the year following the Criminal Law Committee's formal endorsement in 2002 of early termination as a cost-containment measure. As

Table 1 reports, by 2005, early terminations comprised 21.3 percent of successful closings (i.e., cases closed without revocation). From 2007 to 2011, which were relatively favorable budget years, the percentage fell to 17.9 percent. However, in 2012, perhaps as a response to austere budgets and renewed focus on early termination as a cost-containment strategy, early terminations rose nearly a percentage point to 18.7 percent, comparable to 2008 levels.

The overall decline in the percentage of early-term cases from 2005 may be the result of the changing nature of persons under supervision, as the average risk prediction and criminal history scores of persons under supervision have been steadily rising. Also, belying the national trend is considerable district-to-district variation, with early termination rates ranging from 46 percent of successful closings in one district to zero in another.

The focus on early termination for purposes of cost containment has been based on the belief that, if limited to appropriate cases, early termination would not adversely affect community safety. A preliminary study conducted by the AO in 2009 seems to confirm that belief. In this study, the AO randomly selected 554 persons granted early termination in fiscal year 2005 and matched them to an equal number of persons who reached full expiration that same fiscal year with comparable criminal histories, Risk Prediction Index (RPI) scores, and personal characteristics. In the three-year follow-up period, persons granted early termination were charged with fewer new offenses than the comparison group, and any new charges were generally less serious. Specifically, 80 persons granted early termination (14.4 percent) had new criminal charges[1] filed against them, while 90 persons (16.2 percent) of the full-term group had new charges filed against them. Of the new charges filed against the early termination group, 30.3 percent were felonies, while 36.5 percent were felonies for the comparison group. There was only one case among the early termination group that resulted in a known conviction for a violent new offense. According to available records most of the new charges were for misdemeanor or petty offenses, and more than 20 percent of the charges were either dismissed or ended in acquittal.

**Table 1.**

*Percentage of Early Terminations of Successful Terminations (Closings) by Year*

| Year | Total Closings (excluding Revocations) | Early Terminations | |
|---|---|---|---|
| | | Number | Percent |
| 1995 | 25,656 | 4,214 | 16.4 |
| 1996 | 26,844 | 4,061 | 15.1 |
| 1997 | 26,307 | 3,875 | 14.7 |
| 1998 | 25,687 | 3,668 | 14.3 |
| 1999 | 26,594 | 3,524 | 13.3 |
| 2000 | 26,670 | 3,422 | 12.8 |
| 2001 | 27,951 | 3,222 | 11.5 |
| 2002 | 29,363 | 3,458 | 11.8 |
| 2003 | 31,354 | 5,217 | 16.6 |
| 2004 | 34,421 | 7,057 | 20.5 |
| 2005 | 33,472 | 7,119 | 21.3 |
| 2006 | 36,595 | 7,560 | 20.7 |
| 2007 | 35,403 | 6,809 | 19.2 |
| 2008 | 35,666 | 6,626 | 18.6 |
| 2009 | 35,835 | 6,494 | 18.1 |

| Year | Total Closings (excluding Revocations) | Early Terminations | |
|------|----------------------------------------|--------------------|----|
| | | Number | Percent |
| 2010 | 36,414 | 6,738 | 18.5 |
| 2011 | 37,522 | 6,710 | 17.9 |
| 2012 | 38,713 | 7,239 | 18.7 |

Armed with initial empirical evidence suggesting that early termination of appropriate offenders does not compromise public safety, the Judicial Conference continues to pursue early termination as a cost-containment measure. Public safety, of course, remains a paramount concern, however, and the AO continues to monitor the effectiveness of early termination as a measure that permits probation offices to focus supervision resources on persons most likely to recidivate, without compromising the statutory purposes of probation and supervised release.

This year, the AO conducted a similar but considerably broader-scale study on offenders who were granted early termination to determine if the results are consistent with the earlier, more preliminary, study. Using a more recent cohort of offenders whose supervision terminated in 2008, the researchers compared rearrest rates of 1,436 early-termed offenders with a matched group of offenders who served their entire supervision term. A three-year follow-up period was used to examine the rate at which offenders from the two comparison groups were arrested for new criminal behavior.

back to top

## Methodology

There were 15,266 supervised release (TSR) and probation cases closed in fiscal year 2008, of which 3,814 were for early termination and 11,452 were for successful expiration of term. This total excludes cases with missing RPI and criminal history scores, offenders younger than 18 years of age, as well as sex and violent offenders. Sex offenses included cases coded in the Probation and Pretrial Services Case Management System (PACTS) as rape or sex offense. Violent offenses included cases coded in PACTS as assault, firearms, homicide, kidnapping, racketeering, robbery, and simple assault. Of the 3,814 early-term cases, 1,436 were successfully matched to full-term cases by RPI category score (low, medium, high), criminal history category, gender, age category (5-year intervals), and district supervised. In total, this analysis includes 2,872 early- and full-term cases.

The research team leveraged the infrastructure built to support its Results-Based Framework (Baber, 2010). Under this framework, arrest records are assembled from criminal history databases and matched with data from PACTS. Consistent with the definition of recidivism established under this framework, the first arrest for new criminal conduct[2] within three years following the end of the supervision is analyzed for the two comparison groups.

back to top

## Description of Study Population

*Age*

As a result of the matching for this study, average ages of early-term and full-term offenders are nearly identical (Table 2). Full-term cases have an average age of 39.1 years at the start of supervision and 41.5 years at the end of supervision. Early-term cases have an average age of 39.5 at the start of supervision and 41.5 years at the end of supervision. Offenders who completed a full term of supervision were roughly the same age as their early-term counterparts (36.3 years old and 36.25 years old, respectively) at the time of their post-supervision arrest.

*Type of Supervision*

Appendix - Page 8

The proportion of probation and supervised release cases is similar for both study groups. Probation cases accounted for 32.7 percent of all full-term cases and 35 percent of all early-term cases (Table 3).

*Risk Level*

Because early termination criteria heavily favor low-risk offenders, as expected, low-risk offenders accounted for the majority of offenders in this study (74.4 percent). Medium-risk offenders accounted for 23.7 percent and high-risk offenders accounted for 1.8 percent (Table 4).

back to top

**Findings**

As Table 5 illustrates, almost 15 percent (14.7) of all cases in the study cohort had a new arrest and offenders who served their entire supervision term had a rate nearly twice that of the offenders who received early termination (19.2 percent to 10.2 percent, respectively). Similarly, the rearrest rates for both study groups for major offenses only were tabulated (see Table 6). When minor offenses are excluded, the recidivism rates for both early-term and full-term offenders are considerably lower, but the proportion of rearrests between the two groups is consistent. Only 5.9 percent of early-term offenders were rearrested for a major offense following their release from supervision compared to 12.2 percent of full-term offenders.

**Table 2.**

*Age at Start and End of Supervision for All Cases and Cases with a Post-Supervision Arrest*

|  | All Cases | | | | Post-Supervision Arrest | | | |
|---|---|---|---|---|---|---|---|---|
|  | Full term | | Early term | | Full term | | Early term | |
|  | Start | End | Start | End | Start | End | Start | End |
| N | 1,436 | 1,436 | 1,436 | 1,436 | 276 | 276 | 147 | 147 |
| Mean | 39.1 | 41.5 | 39.5 | 41.5 | 34.0 | 36.3 | 34.3 | 36.3 |
| Median | 38.0 | 40.0 | 38.0 | 40.0 | 32.0 | 34.0 | 34.0 | 35.0 |

**Table 3.**

*Supervision Type for All Cases*

| Supervision Type | All Cases | | | |
|---|---|---|---|---|
|  | Full term | | Early term | |
|  | Freq. | Pct. | Freq. | Pct. |
| Probation | 470 | 32.7 | 502 | 35.0 |
| TSR | 966 | 67.3 | 934 | 65.0 |
| **Total** | **1,436** | **100.0** | **1,436** | **100.0** |

**Table 4.**

*Risk Level of All Offenders*

| RPI category | All Cases | | | |
|---|---|---|---|---|
|  | Full term | | Early term | |
|  | Freq. | Pct. | Freq. | Pct. |
|  |  |  |  |  |

| | | | | |
|---|---|---|---|---|
| Low risk | 1,069 | 74.4 | 1,069 | 74.4 |
| Medium risk | 341 | 23.7 | 341 | 23.7 |
| High risk | 26 | 1.8 | 26 | 1.8 |
| **Total** | **1,436** | **100.0** | **1,436** | **100.0** |

**Table 5.**
*Rearrest Rate for Full-Term and Early-Term Offenders (All Offenses)*

| New Arrest | All Cases | | Post-Supervision Arrest | | | |
|---|---|---|---|---|---|---|
| | | | Full term | | Early term | |
| | **Freq.** | **Pct.** | **Freq.** | **Pct.** | **Freq.** | **Pct.** |
| No | 2,449 | 85.3 | 1,160 | 80.8 | 1,289 | 89.8 |
| Yes | 423 | 14.7 | 276 | 19.2 | 147 | 10.2 |
| **Total** | **2,872** | **100.0** | **1,436** | **100.0** | **1,436** | **100.0** |

**Table 6.**
*Rearrest Rate for Full-Term and Early-Term Offenders (Major Offenses Only)*

| | Full term | | Early term | |
|---|---|---|---|---|
| | **Freq.** | **Pct.** | **Freq.** | **Pct.** |
| No | 1,261 | 87.8 | 1,351 | 94.1 |
| Yes | 175 | 12.2 | 85 | 5.9 |
| **Total** | **1,436** | **100.0** | **1,436** | **100.0** |

### *Rearrest Rates by Supervision Type*

Rearrest rates for offenders serving terms of supervised release (TSR) cases are slightly higher than for probation cases for both early-term and full-term cases. Of the 470 full-term probationers, 17.7 percent (n = 83) were arrested within 36 months of completing their supervision term (see Table 7). In comparison, 9.2 percent (n = 46) of the 502 early-termed probationers were rearrested within 36 months of completing their supervision term. Of the 966 offenders on TSR who completed a full term of supervision, 20 percent (n = 193) were rearrested within 36 months of completing their supervision term. In comparison, 10.8 percent (n = 101) of the 934 early-term TSR cases resulted in a post-supervision rearrest.

*Time to Rearrest*

As shown in Table 8, the time to post-supervision rearrest is slightly longer for early-term offenders. On average, full-term offenders were arrested 18.8 months after completing their supervision term while early-term offenders were arrested 19.4 months after being released from supervision.

*Risk Level*

As expected, an accurate prediction of the risk of re-offending as indicated by the Risk Prediction Index (RPI) holds true for both early-term and full-term offenders who have completed supervision (Table 9). That is, high-risk offenders in both study groups have the highest rearrest rates. However, high-risk offenders who were granted early term were much less likely to be rearrested than their full-term high-risk counterparts. Though only six high-risk early-term offenders were

rearrested, high-risk offenders accounted for 53.8 percent (n = 14) of the post-supervision arrests
for full-term offenders but only 23.1 percent of arrests for early-term offenders.

*Time under Supervision*

Early-term offenders were sentenced to supervision terms that were 12 months longer than
offenders who completed a full term of supervision (39.8 months to 27.8 months, respectively).
Although early-term offenders had longer supervision sentences, on average, they were on
supervision 3.8 months fewer than full-term offenders (24 months to 27.8 months, respectively).
On average, arrest-free early-term offenders were released from supervision 15.7 months before
their scheduled supervision term was set to expire (Table 10).

**Table 7.**

*Supervision Type for Cases with a Post-Supervision Arrest*

| Supervision Type | Post-Supervision Arrest | | | | | |
| | Full term | | Early term | | Total | |
| | Freq. | Pct. | Freq. | Pct. | Freq. | Pct. |
|---|---|---|---|---|---|---|
| Probation | 83 | 17.7 | 46 | 9.2 | 129 | 13.3 |
| TSR | 193 | 20.0 | 101 | 10.8 | 294 | 15.5 |
| **Total** | **276** | **19.2** | **147** | **10.2** | **423** | **14.7** |

**Table 8.**

*Time to Post-Supervision Arrest*

| | Days to Arrest | | Months to Arrest | |
| | Full term | Early term | Full term | Early term |
|---|---|---|---|---|
| N | 276 | 147 | 276 | 147 |
| Mean | 586.9 | 604.9 | 18.8 | 19.4 |
| Median | 576.5 | 647.0 | 18.0 | 21.0 |

**Table 9.**

*Risk Level of Offenders with a Post-Supervision Arrest*

| RPI category | Post-Supervision Arrest | | | | | |
| | Full term | | Early term | | Total | |
| | Freq. | Pct. | Freq. | Pct. | Freq. | Pct. |
|---|---|---|---|---|---|---|
| Low risk | 147 | 13.8 | 77 | 7.2 | 224 | 10.5 |
| Medium risk | 115 | 33.7 | 64 | 18.8 | 179 | 26.2 |
| High risk | 14 | 53.8 | 6 | 23.1 | 20 | 38.5 |
| **Total** | **276** | **19.2** | **147** | **10.2** | **423** | **14.7** |

**Table 10.**

*Supervision Term, Months Supervised, and Months Saved by Early Termination for Offenders with
No Post-Supervision Arrest*

Appendix - Page 11

|        | Supervision Term—Months | | Months Supervised | | Months Saved | |
|--------|------------|------------|------------|------------|------------|------------|
|        | **Full term** | **Early term** | **Full term** | **Early term** | **Full term** | **Early term** |
| N      | 1,160 | 1,289 | 1,160 | 1,289 | 1,160 | 1,289 |
| Mean   | 27.8 | 39.8 | 27.8 | 24.0 | 0.0 | 15.7 |
| Median | 35.0 | 35.0 | 35.0 | 24.0 | 0.0 | 14.0 |

*Types of Offenses*

As shown in Figure 1, when both major and minor offenses are included, the proportions of offense types for which the two groups are rearrested are similar. Public order offenses comprise the majority, followed by drugs, and then property offenses. Early-term offenders have a slightly higher percentage of public-order offenses, compared to their full-term counterparts (28.6 percent and 24.6 percent respectively). Drug offenses accounted for nearly an identical percentage of offenses for both study groups (20.4 percent for early-term offenders and 21 percent for full-term offenders.) Property offenses represented the third most frequent offense for both groups and the percentage of property crimes for early-term offenders was slightly lower than the percentage for the comparison group (15 percent and 17.8 percent, respectively). Violent offenses were a close fourth in terms of most frequent post-supervision arrest for both groups, with a slightly lower percentage of early-term offenders arrested for violence offenses (14.3 percent and 15.2 percent, respectively).

*Types of Major Offenses*

When arrests for minor offenses[3] are excluded from the tabulations, drug, property, and violence offenses remain the most prevalent offenses for which both comparison groups are arrested (Figure 2). Major drug offenses accounted for a slightly greater percentage of arrests for early-term offenders than for full-term offenders (35.3 percent of arrests for early-term offenders and 33.1 percent for full-term offenders.) Property offenses represented the second most frequent major offense for both study groups and early-term offenders were arrested at a slightly lower rate than their counterparts for those property offenses (25.9 percent and 28 percent, respectively). Violent offenses were a close third most frequent arrest for a major offense for both groups, with early-term offenders having a slightly greater percentage than full-term offenders (24.7 percent and 24 percent, respectively).

*Months Saved on Supervision for Offenders Who Were Not Rearrested*

Early-terminated offenders in fiscal year 2008 who had no post-supervision arrest were released 15.7 months earlier than their scheduled expiration date, which was one month earlier than early-term offenders released in fiscal year 2005. This suggests that even though early-term offenders were released sooner, their risk of re-offending did not increase (see Table 11).

back to top

## Discussion

Results from the AO's most recent study of offenders terminated in 2008 are compelling. The results suggest that offenders granted early termination under the current policies pose no greater danger to the community than offenders who serve a full term of supervision. These findings reaffirm the notion that early termination policies allow officers to make responsible decisions about which offenders to recommend for an early termination of their supervision term. Nearly twice as many full-term offenders were rearrested for major or minor offenses within three years as their counterparts who were terminated early (19.2 percent versus 10.2 percent respectively, see Table 5). When minor offenses are excluded from the tabulations, the relative proportion of rearrest rates for the two groups remains consistent, but the rates themselves are considerably lower for both groups. Specifically, only 5.9 percent of early-termed offenders were rearrested for major offenses compared to 12.2 percent of their full-term counterparts (Table 6). This suggests that

Appendix - Page 12

probation officers should strongly consider offenders' actuarially predicted risk in the decision to recommend early termination of supervision.



**FIGURE 1.**
*Offense Type for Post-Supervision Arrest Early- and Full-Term Offenders (All Offenses)*



**FIGURE 2.**
*Types of Offense for Post-Supervision Arrest by Close Type (Major Offenses Only)*

**Table 11.**
*Comparison of Months Saved by Early Termination for Offenders with No Post-Supervision Arrest—FY 2005 and FY 2008*

| | FY 2005 Cases Months Saved | | FY 2008 Cases Months Saved | |
|---|---|---|---|---|
| | | | | |

Appendix - Page 13

|        | Full term | Early term | Full term | Early term |
|--------|-----------|------------|-----------|------------|
| N      | 443       | 463        | 1,160     | 1,289      |
| Mean   | 0.0       | 14.7       | 0.0       | 15.7       |
| Median | 0.0       | 12.0       | 0.0       | 14.0       |

Not only are early-terminated offenders arrested less frequently than their full-term counterparts, the time to rearrest is slightly greater. Specifically, early-term offenders remained arrest free for an average of 19.4 months compared to 18.8 for those who were full term. (See Table 8. Median times to arrest were 18 months for full term and 21 months for early term.) Further, the proportions of the types of offenses that constituted the arrests were nearly identical for both groups. For both groups, drug, property, and violent offenses comprised over 85 percent of all first arrests (Figure 2).

Because early termination criteria heavily favor persons at low risk to recidivate as indicated by the RPI or Post Conviction Risk Assessment (PCRA), approximately three-quarters (74.4 percent) of the offenders in this study group were low risk, 23.7 percent were medium risk, and 1.8 percent were high risk (Table 4). Overall, of the 423 offenders who were arrested from both comparison groups, high-risk offenders accounted for nearly 40 percent (38.5 percent) of those who were rearrested in the follow-up period (Table 9). In comparison, low-risk offenders accounted for 10.5 percent of those rearrested.

Perhaps more significantly, the results of the study indicate that while the early termination policy does not, as currently administered, compromise community safety, the attributable cost avoidance is significant. Although early-terminated offenders in the study originally received longer supervision sentences by approximately a year (39.8 months versus 27.8 months, see Table 10), on average they served 3.8 fewer months than full-term offenders (24 months to 27.8 months, respectively). At the most-recently published monthly cost of supervision of $286.11 per offender,[4] this equates to $1,087 per offender terminated early, for a total of $7,754,039 for the 7,132 offenders who received early termination in calendar year 2012 alone.

The results of this study may inform other initiatives that are being considered by the Criminal Law Committee and the AO. For example, the Committee and AO staff may wish to consider whether early termination—and the risk principle generally—should be built into the next version of the staffing formula. Also, the Committee may want to consider whether changes to policy or legislation should be recommended to allow for the early termination of supervision for inmates who are compassionately released from prison under 18 U.S.C. § 3582(c). A recent report by the Inspector General of the Department of Justice critiqued the BOP's management of the compassionate release program. The BOP is currently reviewing its policies, and the courts should anticipate an increase in the number of inmates who are released from prison early under this authority. Because many of the inmates who are compassionately released are suffering from terminal illnesses, it may be unnecessary from a public safety perspective and inefficient from a resource perspective to continue to provide supervision in these cases.

back to top

Endnotes

The articles and reviews that appear in *Federal Probation* express the points of view of the persons who wrote them and not necessarily the points of view of the agencies and organizations with which these persons are affiliated. Moreover, *Federal Probation's* publication of the articles and reviews is not to be taken as an endorsement of the material by the editors, the Administrative Office of the U.S. Courts, or the Federal Probation and Pretrial Services System. Published by the Administrative Office of the United States Courts www.uscourts.gov
Publishing Information



# Early Termination of Supervision Cost-Effective and Safe

(September 24, 2013)
**Related Links:**
Early Termination of Supervision: No Compromise to Community Safety [1]
Federal Probation Journal (September 2013) [2]

A federal Judiciary study of early termination [1] of supervision of low-risk offenders shows that the practice not only saves money, it does so without compromising public safety.

Three years after being released from supervision only 10.2 percent of early-term offenders had been rearrested, while 19.2 percent of full-term offenders were rearrested. Early termination is the policy of terminating a term of supervised release and discharging the defendant at any time after the expiration of one year of supervised release, providing certain criteria are met.

Early-term offenders save the probation and pretrial services system time when officers are no longer required to supervise them. Offenders receive early release from supervision an average of 15.7 months before their scheduled supervision term is set to expire. This, according to the report, allows districts to devote more resources to supervising and servicing offenders who are a greater risk to society.

Early termination also saves money. In fiscal year 2012, the supervision of more than 7,000 offenders was terminated early, saving the Judiciary more than $7.7 million.

"This practice promotes justice, conserves resources, and protects the public," said Judge Robert Holmes Bell, chair of the Judicial Conference Committee on Criminal Law.

The report looked at cases closed in FY 2008, then tracked for three years after supervision terms ended to see whether or not new crimes were committed. There were 15,266 cases of offenders with terms of supervised release following imprisonment and probation cases closed in fiscal year 2008, of which 3,814 were for early termination and 11,452 were for successful expiration of term.

The Judicial Conference endorsed early termination in 2003, as part of revised post-conviction supervised release policies. Under this policy, and according to statute, a court may terminate the terms of probation in felony cases after one year of supervision, if the offender's conduct warrants the change and it is in the interest of justice to do so.

Criteria were created by the Judicial Conference to help probation officers properly identify offenders for early termination of supervision. Those criteria include stable community reintegration; progressive strides toward supervision objectives; no history of violence and

no aggravated role in the offense of conviction; no recent evidence of alcohol or drug abuse, or psychiatric episodes; and no identifiable risk to public safety.

**Related Topics:** Probation and Pretrial Services [3]

Published on *United States Courts* (http://news.uscourts.gov)
**Source URL:** http://news.uscourts.gov/early-termination-supervision-cost-effective-and-safe

**Links:**
[1] http://www.uscourts.gov/viewer.aspx?doc=/uscourts/FederalCourts/PPS/Fedprob/2013-09/no-compromise.html
[2] http://www.uscourts.gov/viewer.aspx?doc=/uscourts/FederalCourts/PPS/Fedprob/2013-09/index.html
[3] http://news.uscourts.gov/topics/probation-and-pretrial-services

# Exhibit A

To: The Honorable Judge George H. King,

Dear Judge King,

I am writing to you today to give you a little bit of information on what I have been doing since the release of my incarceration. How my life has changed and all the outreach ministry activities I'm involved in.

When I went to prison, I never experienced or had seen first hand all the hurt that really existed in others and in this world. I regrettably state that I was a participant in some of that hurt as well, as a result of my past behaviors and actions.

Experiencing comforting a mother who's child died and wasn't able to attend the funeral is heart wrenching. Hearing that mother pleading with God to help her and crying herself to sleep at nights has never left me. I would sit with her for countless hours, talking, praying, and sometimes just sitting next to her in silence. Or, a mother who's two young children that had to be cared for in foster care, and being put up for adoption. The mother wouldn't be released in time to take back custody of her children. All she could do was cry out in pain as the letters came in the mail informing her of the process. I spent many hours with her too, encouraging her, praying, and leading her to Christ.

I remember many more of these tragic stories. They sparked a flame of desire in me. It made me hungry for helping people, a deep passion. It brought me closer to God. In the end we can't take anything with us when we leave this earth, only how each of our names will remind someone of something when recalled. I asked myself how I want to be remembered, by my children, my family, friends, and the world. It's all I think about, helping others that are hurting and in need. Giving sleeping bags and tents to the homeless, passing out groceries to needy mothers and children, helping children in orphanages, and leading people to Christ. My husband and I both desire this so much and only that much fire and desire can come from God. I feel a calling on my life and I will fulfill it. Going to prison was one of the worst things that ever happened to me in my life, but I wouldn't change it because I wouldn't be who I am today. All the outreach I'm involved in and the goals I'm pursuing have me on a much better path in this life. I'm stronger, wiser, and have become so much closer to God. It's in my darkest hours that I've drawn closer to Him. I'm completely thankful for all my experiences and trials. Something horrible has turned into something beautiful.

Sincerely,

Trina Kenney

# Exhibit B

## DECLARATION OF KIM SANDERS

I, KIM SANDERS, declare:

1. I am a Law Fellow with the Office of the Federal Public Defender for the Central District of California. I am licensed to practice law in the State of California and I am admitted to practice in this Court.

2. I called the California Bureau of Real Estate and spoke to an Application Investigator.

3. I was advised that an applicant who was on parole or supervised release would have her real estate license denied.

4. I was also advised that early termination of parole or supervised release by the court would be viewed favorable as evidence of rehabilitation in the evaluation of an application.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 21, 2014, at Los Angeles, California.


_/s/._
KIM SANDERS

1

# Exhibit C

November 14th, 2014

Rick R. Kenney
8231 Deer Haven Drive
Piñon Hills, CA 92372
(760) 646-2360


Judge G. H. King
255 East Temple Street
Courtroom 650
Los Angeles, CA 90012

To The Honorable George H. King,

I am writing this letter today to request early termination for my wife, Trina L. Kenney. I have 3 valid premises for making this request.

First. Probation is prohibiting Trina from pursuing her dream career as a real estate broker. She has finished all her necessary course work and is ready to take the licensing exam. However, according to a California State Licensing Board representative, there will be an automatic denial for any individual who is currently on probation at the time the exam is submitted. Early termination will allow Trina to work toward her financial goals and dreams.

Second. Travel restrictions. I am an evangelist and president of Trinity House International, a non-profit organization aimed at outreach and humanitarian aid both nationally and abroad. This organization was birthed out of Trina's desire to help people in distress. While incarcerated, Trina heard heartbreaking stories of abuse, addictions, abandonment, poverty, and human trafficking unparalleled to anything she had ever heard before. This is what inspired us to form Trinity House. Unfortunately we had no idea how hard it would be to fulfill our vision while Trina remains under supervision. The crippling effects are two fold:

    a.) When unexpected or short notice travel is required. A recent example of this scenario happened on Nov. 8th, 2014 when I was notified of a relief trip to Henderson, NV to Destiny House, a safe house for women enslaved

in human trafficking, to deliver supplies and provide counseling. I was asked if Trina could accompany the other volunteers because of her knowledge of the lifestyle. Trina was incarcerated with many of these types of women and even had a roommate that was a prostitute. But because of the travel restrictions Trina was unable to help those women. Early termination would eliminate that obstacle.

   b.) International travel. Because of the vision of the organization we want to help others wherever there is a need. We have opportunities right now to minister in Sierra Leone, Africa, Tenali, India, and San Jose, Mexico. Trina and I were invited to Tenali to participate in a crusade but unfortunately I've had to stall due to international travel restrictions. Likewise, we have an open opportunity to help homeless and needy children in San Jose, Mexico working with Robert and Donna Schuller, son of Robert Schuller Sr.  founder of the Crystal Cathedral. However like the previous instance I've had to strategically postpone until Trina can travel abroad.

3.) good conduct and reform. It's my sincere belief that Trina poses no risk or threat to herself not the general public. Trina has completed approximately 2,000 hours of counseling in total, and it has greatly benefited her life. Trina is moving in a positive and constructive direction. Due to the change in Trina's behavior, and from the way she now thinks about her life and the lives of others, there is no doubt in my mind that she will move on from this to become another success story.

I want to conclude by saying how proud I am of my wife. Trina has made tremendous strides in a good direction and that is the reason I am appealing to the court today in considering terminating probation.

Thank you, your Honor, for your valuable time and consideration.

Sincerely,


Rev. Dr. Rick R. Kenney

# Exhibit D

**DECLARATION OF TRINA KENNEY**

I, Trina Kenney, hereby state and declare as follows:

1. I am the defendant in *United States v. Trina Kenney*, CR-10-969. I am currently serving a term of supervised release.

2. I am in full compliance with the terms of my supervised release, and I have been since it began. I have completed more than18 months of supervised release without a single disciplinary incident or violation.

3. I reside with my husband, Rick Kenney, and our three children. We have a son, age 16, and two daughters, ages 14 and 6. We have rented our current home for approximately five years.

4. I currently work as a personal assistant for my father and mother. I work approximately 30 hours per week as a personal assistant.

5. I would like to get my real estate license and become a real estate agent. Getting my real estate license would start me on a rewarding career, allow me the flexibility to care for my children, and provide income for my family. I have been studying for the examination to get my license while I have been on supervised release. After taking the examination, I would submit an application to the Bureau of Real Estate, which would be reviewed before I could receive my license. It is my understanding of the Bureau of Real Estate regulations that my application will not be approved until my supervised release is completed. It is also my understanding that early discharge from supervised release is viewed as evidence of rehabilitation and may be helpful in obtaining approval of my application.

6. I am the primary caregiver for my children. I work from home so I can care for them when they are not at school. I take my children to school, to their extracurricular activities, and doctor's appointments. I help my children with their homework. I attend my son's football games and my older daughter's cheerleading meets. I have volunteered to help with the football team's snack bar, and have hosted cheer team meetings in my home.

7. I frequently take care of my elderly grandmother. I care for her, stay with her so she is not alone, take her to her doctor's appointments, and run errands for her.

8. I attend church with my family every Sunday. I frequently volunteer to help at church functions.

9. My church recently went to Nevada to donate clothing and food to Destiny House, a safe house for women who have been prostituted and abused. Due to the conditions of my supervised release, I did not think that I could attend.

10. My husband has his own ministry and will be opening his own church in Victorville. I will be in charge of the music ministry for the church.

11. My husband travels for speaking engagements six to twelve times a year. I would like to be able to travel with him regularly.

12. I volunteer with my husband's non-profit organization, Trinity House International, doing

Scanned by CamScanner

outreach activities, such as passing out sleeping bags and food to the needy. We conduct outreach activities two to four times per month.

13. I completed six months of pretrial personal counseling. While in custody, I completed the RDAPprogram. I completed six months of counseling as part of the after-care component of RDAP. I completed six months of once-a-week private counseling as part of my supervised release. After the modification of my supervised release, my Probation Officer at the time, Dena Vasquez, had me complete at-home workbooks instead of counseling sessions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

1-19-15
Date       Trina Kenney

Scanned by CamScanner

## PROOF OF SERVICE

I, **Damon Berry**, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **Ex Parte Application for Early Termination of Supervised Release** on the following individual(s) by:

| [X] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [ ] Faxing same via facsimile machine addressed as follows: |
|---|---|---|---|

**Kim Cassulo**

**United States Probation Officer**

**600 U.S. Courthouse**

**312 North Spring Street**

**Los Angeles. CA 90012-4708**

This proof of service is executed at Los Angeles, California, on **January 20, 2015**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

/s/ Damon Berry                 .
**Damon Berry**