STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JAMES A. BOWMAN (Cal. Bar No. 220227)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-2213
     Facsimile:  (213) 894-6962
     E-mail:      james.bowman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Nos. CR 10-969-GHK |
|---|---|
| Plaintiff, | OPPOSITION TO EX PARTE APPLICATION FOR EARLY TERMINATION OF SUPERVISED RELEASE |
| v. | |
| TRINA KENNEY, | |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney James A. Bowman, hereby files its Opposition to defendant Trina Kenney's Ex Parte Application for Early Termination of Supervised Release.  This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 3, 2015          Respectfully submitted,

                                 STEPHANIE YONEKURA
                                 Acting United States Attorney

                                 ROBERT E. DUGDALE
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                        /s/
                                 JAMES A. BOWMAN
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

The government respectfully requests that the Court deny defendant Trina Kenney's ex parte application for early termination of supervised release.

Early termination of defendant's supervised release is not warranted based on defendant's conduct, nor would it be in the interest of justice, for several reasons.  First, defendant had a history of fraud even before her conviction in this case, as well as numerous other arrests and problems with local law enforcement. Defendant also committed the crime in this case while on probation for two prior convictions, apparently without detection by her supervising probation officers in those separate cases.

Second, defendant's crime in this case showed a lack of respect for the law, as well as an extreme callousness to her victims.  Over a period of several years, defendant defrauded approximately 90 victims out of more than $200,000 by selling them horses that were wild and dangerous, as well as animals that were so seriously injured that they could hardly walk, stand, or eat and had to be euthanized. She used at least 12 aliases in connection with her criminal activity to distance herself from the conduct.  Victims reported that when they tried to get their money back, defendant yelled at them and insulted them, and some even feared for their safety.

Third, defendant has only been on supervised release for 20 months, and has 16 months of supervision remaining.  Contrary to her assertion that her performance on supervised release has been "exemplary," her conduct thus far on release provides further reason to deny the application.  In May 2014, the United States Probation

Office filed a Violation Report and petition alleging that defendant had violated the terms of her supervised release by, among other things, (1) failing to provide accurate information regarding her household finances, which was necessary to ensure that her monthly restitution payments were reasonable, and (2) participating in the sale of sick and underage puppies.  There was no finding by this Court regarding the alleged violations; the parties resolved the situation by stipulating to an amendment of defendant's conditions of supervised release to provide for more strict supervision.

At this point, defendant has only been subject to these increased conditions for approximately six months.  Given her prior criminal history, and the issues that arose earlier in her supervision, the government submits that the fact that she has not violated these more stringent conditions is a reflection of the benefits of this increased supervision rather than a lack of need for it.  Further, according to the probation office, defendant has only paid approximately $600 in restitution during her 20 months of supervision, and still owes $272,064.50 to the victims.

Continued supervision is thus warranted given defendant's established history of engaging in fraud (including using her children, and other aliases, to distance herself from her conduct), the need to deter defendant from engaging in any similar schemes, to ensure that defendant continues to participate in counseling sessions with the Probation Officer, and to ensure that she continues to pay restitution to the victims.

The government respectfully requests that the Court deny defendant's application for early termination of supervised release.

**II.   ARGUMENT**

    **A.   Applicable Law**

A term of supervised release is a part of a defendant's sentence and, like imprisonment, substantially restricts a defendant's liberty.  United States v. Weber, 451 F.3d 552, 559 (9th Cir. 2006); United States v. Gall, 552 U.S. 38, 48 (2007).  The Court has authority to grant early termination of a remaining term of a defendant's supervised release after one year of supervised release has elapsed.  See 18 U.S.C. § 3583(e)(1).  Before terminating supervised release, however, the Court must be "satisfied that such action is warranted by the conduct of the defendant and the interest of justice," taking into consideration certain enumerated 18 U.S.C. § 3553(a) factors.  18 U.S.C. § 3583(e)(1).  Defendant has the burden of demonstrating that receiving the benefit of early termination is justified.  Weber, 451 F.3d at 559 n.9 (9th Cir. 2006) (citing United States v. Weintraub, 371 F.Supp.2d 164, 167 (D.Conn. 2005) and United States v. McKay, 352 F.Supp.2d 359, 361 (E.D.N.Y. 2005)).

The requirement that early termination be "in the interest of justice" gives the Court latitude to consider factors other than the defendant's conduct in considering whether to terminate supervised release early.  See United States v. Emmett, 749 F.3d 817, 819 (9th Cir. 2014); United States v. Pregent, 190 F.3d 279, 284 (4th Cir. 1999).  Section 3583(e)(1), which authorizes early termination, enumerates various Section 3553(a) factors to be considered that are not limited to defendant's evidence of rehabilitation, e.g., the nature and circumstances of her offense, the history and characteristics of the defendant, the need to afford adequate deterrence and protect the public, and the need to provide

3

restitution to the victims of defendant's crime.  18 U.S.C. § 3553(a)(1), (2)(B) and (C), (4)(A), (6).  See United States v. Evertson, 2011 WL 841056 at *2 (D. Idaho March 7, 2011) (applying pertinent Section 3553(a) factors to deny request for termination).

As the Ninth Circuit observed in United States v. Miller, 205 F.3d 1098 (9th Cir. 2000):

> Section 3583(e) provides the district court with retained authority to: revoke, discharge, or modify terms and conditions of supervised release . . . in order to account for new or unforeseen circumstances.  Occasionally, changed circumstances 'for instance, exceptionally good behavior by the defendant or a downward turn in the defendant's ability to pay a fine or restitution as conditions of release' will render a previously imposed term or condition of release either too harsh or inappropriately tailored to serve the general punishment goals of section 3582(e)(2).

205 F.3d at 1101, quoting United States v. Lussier, 104 F.3d 32, 36 (2nd Cir. 1997).

Defendant argues that there is a presumption in favor of early termination.  (Application at 6-7.)  But she relies entirely on the "Guide to Judiciary Policy" in support of this claim; to government counsel's knowledge, no case has found such a presumption to apply, nor does defendant cite to any statutory authority or case law supporting such a presumption.  Such a presumption would also be contrary to the fact that defendant, rather than the government, bears the burden of demonstrating that early termination is warranted.  And several courts have held that simply complying with the terms of supervised release does not justify early termination, noting that if full compliance were sufficient, "the exception would swallow the rule."  Folks v. United States, 733 F.Supp.2d 649, 652 (M.D. N.C. 2010); United States v. Medina, 17 F.Supp.2d 245, 247 (S.D.N.Y. 1998); see also Weintraub, 371 F.Supp.2d at 166-67.

4

**B.   Defendant Has Failed to Demonstrate That Early Termination of her Supervised Release Is Warranted**

Defendant has failed to establish that early termination of supervised release, a full 16 months before her supervision is set to expire, is warranted by her conduct or that termination would be in the interest of justice.

First, defendant's history and characteristics weigh against terminating her supervision with well over a year left in her three-year term of supervised release.  Defendant had an extensive criminal history involving fraud even before her conviction in this case.  For example, in 2003, she was convicted in Seattle, Washington, and separately in Fullerton, California, for schemes where she defrauded victims (using an alias) out of thousands of dollars by "renting" homes to them that she did not in fact own.  (PSR ¶¶ 37-42.)

Beyond these convictions, defendant had numerous other arrests and problems with the law.  (Govt. Resp. to Def. Sent. Pos. (Docket No. 25) at 3-4.)  Specifically, the government noted in its sentencing materials that defendant was well known to local law enforcement in San Bernardino County based on numerous calls related to defendant's fraud on victims, as well as for "mutual combatant" variety domestic violence allegations.  (Id.)  Defendant also frequently put utilities, bank accounts, and phone bills in the names of her children – conduct that is particularly concerning given the later sales of sick and underage animals, supposedly by her children, while defendant was on supervised release.  (Id. at 5.)  The allegations in the government's sentencing papers were consistent with the uncontested information in the Presentence Report regarding defendant's prior arrests, including information that she had been

5

arrested for brandishing a knife at her father and had slapped both of her parents. (PSR § 49.) Defendant's prior record shows a pattern of criminal behavior dating back over a decade, and underscores the need for continued supervision.

Second, the nature and circumstances of the offense also demonstrate that close supervision of defendant is needed. Defendant's crime in this case was serious. In her application, she downplays her conduct by noting that her crime was non-violent, and casts her conduct as aberrational because she was suffering from depression at the time. (Application at 11.) But defendant carried out a nationwide scheme to steal from victims by selling sick and abused animals. She carried out this scheme over a period of three years and was successful in stealing more than $200,000 from the victims. The length and scope of this scheme took extensive planning and commitment, and demonstrate that her actions (taken in combination with her prior criminal record) were not aberrant conduct at all. Defendant also used over a dozen false names in carrying out the scheme, including "Inga Whittman," "Jackie Hayden," "Sam Haydenburg," "Patricia Jennings," "Rachel Jennings," "Ruth Jennings," "Kate Kenney," "Lisa Kenney," "Sarah Lorenza," "Sierra Rudolph," "Hattie Rush," and "Leslie Watson" (PSR § 13; Plea Agt. (Docket No. 4) at 26) which reflects careful planning and an intentional effort to distance herself from her illegal conduct.

Further, defendant committed this crime while she was on probation in two prior criminal cases (PSR ¶ 46) – apparently without detection by her supervising probation officers (possibly due to her extensive use of false names), or apparent concern by defendant about violating the terms and conditions of her supervision in those cases.

6

Her willingness to violate the terms of supervision in those cases, and do so undetected, on its own should be sufficient reason to deny her request for early termination in this case.

While defendant's crime was non-violent, her actions in carrying out the scheme nevertheless reflected a shocking level of callousness – for the sick and abused animals that she sold, as well as for the safety and well-being of the victims.  She stipulated in the factual basis of her plea that she (1) drugged wild horses to make them appear to be docile, (2) regularly sold sick and abused animals, some of which were so seriously injured or ill that they could hardly walk or stand, and in many cases had to be euthanized, and (3) sold animals that had no registration papers or health certificates. (Plea Agt. at 33-39.)  One horse that defendant sold was "bleeding from its vulva," while another had a club foot, and "was terribly abused."  (Victim Statements ISO Govt. Resp. to Def. Sent. Pos. (Docket No. 25-1) at 1, Supplemental Victim Statements (Docket No. 26-1) at 1.)  The sales of these abused and damaged animals jeopardized the safety of the victims who bought them, many of whom were for children.  One victim, J. Kalayjian, told the government that the horse she bought from defendant was lame in all four legs, and had a propensity for "spooking, rearing, biting, and kicking." Defendant sold this horse to Ms. Kalayjian, knowing that it was intended for her young child.  (Govt. Supp. Sent. Pos. at 7.)

Defendant was unrepentant while carrying out the scheme. Several victims reported that when they tried to recover their money, or raise concerns about the horses they had purchased from defendant, defendant yelled at them, insulted them, and berated them – many to the point where they were in fear for their safety:

7

- "I was lied to, sworn at, threatened, and fleeced out of my hard earned money by a woman who has no sense of decency or humanity."  (Victim P. Donais) (Supp. Victim Stmts. at 1);

- "When she figured out I wasn't going to pay her any more money, then Trina Kenney got nasty, verbal menacing, threatening and attacking me online via email, phone calls, and online posts. ... Dealing with Trina Kenney, the way she [viciously] attacks those she's robbed, is a truly harrowing experience.  For me it was emotionally devastating."  (Victim A. Talbott) (Supp. Victim Stmts. at 3);

- "To hear [other victims'] stories, which were so similar to mine – including the cruel language that Ms. Kenney used when a victim started to question her as to why they weren't getting the horse they paid her for – just opened a fresh wound every time I heard them."  (Victim J. Carpenter) (Victim Stmts. at 6);

- "There was a period of several weeks when I feared she might show up and take something from my property because she had my address ... She even said at one point that she knew where I was and not to mess with her."  (Victim D. Wentzel) (Victim Stmts. at 10);

- "Worse of all was the terrible way she berated me verbally, [o]nce I understood how I was lied to and cheated."  (Victim E. Holmes) (Victim Stmts. at 14-15)

- "I continued to ask Trina for my money back until she got so angry with me that I became frightened.  I was frightened for mine and my [family's] safety."  (C. McClendon) (Victim Stmts. at 18)

Combined with her prior record of fraud schemes, as well as the fact that she carried out this scheme while on supervision in two prior criminal cases, defendant's criminal conduct showed a lack of respect for the law.  She abused animals, ripped off dozens of families, and berated and threatened any victims bold enough to try to get their money back.  Reflecting the seriousness of her conduct, the district court sentenced defendant to 41 months in prison – well over her recommended sentence of probation.  Continued supervision for the duration of her additional three-year term of supervised

8

release is needed to protect the public, and continue to ensure that defendant does not engage in similar schemes in the future.

Third, defendant's conduct while on supervised release reflects the need for supervision in order to protect the public and afford adequate deterrence against additional violations or criminal activity by defendant.  In March 2014, the Humane Society of San Bernardino Valley contacted the probation officer to report that defendant's children had sold severely underage and ill puppies. (May 1, 2014 Violation Report at 2.)  Given the similarity between this conduct and her underlying conviction, as well as the fact that defendant had previously used her children's names in connection with her schemes, the probation officer interviewed defendant about the puppy sales.  (Id.)  Defendant was aware of the puppy sales, and allowed her daughter to sell them in order to teach her how to be self-employed.  (Id.)  According to the probation officer, defendant also told her that the puppies were not underage, and that she had helped give them vaccinations.  (Id. at 3-4.)  (Defendant's counsel later denied that defendant made these statements.)

Because of the similarity between the illegal puppy sales and defendant's prior conviction, the probation officer took these claims very seriously and filed a violation report with this Court.  The probation officer also expressed concern in the report that, if defendant (or her husband) were receiving several thousand dollars from selling puppies, that defendant could afford to make increased restitution payments to the victims.  After an evidentiary hearing was scheduled, but before the Court made any ruling on the alleged violations, defendant stipulated to modifying her conditions of supervised release to allow for more strict supervision.

Specifically, defendant agreed to (1) provide additional financial information to the probation officer, (2) to give the probation officer access to any records regarding any business owned by defendant, (3) to allow the probation officer to search defendant's property upon reasonable suspicion of a violation of supervised release, and (4) to participate in a cognitive-based life skills program.  (See July 10, 2014 Order (Docket No. 50) at 1.)

Defendant has been subject to these increased conditions for only six months.  The government is not aware of any alleged violations by defendant since she has been supervised under these new terms.  The government also believes that the community service and real estate training described in defendant's application are commendable, and are positive signs that she is making progress.  The government believes that these efforts, and the lack of any violations or allegations under the new conditions of release, are an indication of the benefits of supervised release for defendant, rather than evidence that such supervision is not needed.

Finally, defendant's remaining restitution obligation creates a substantial interest in having defendant remain on supervised release.  As of today, defendant still owes $272,064.50 in restitution (approximately 99.8 percent of what she was originally ordered to repay the victims as part of her sentence), and has paid approximarely $600 in restitution during her 20 months on supervised release.  The terms and conditions of defendant's supervised release require defendant to pay restitution in accordance with the Court's judgment.  The conditions of supervised release additionally require defendant to "apply all monies received from income tax refunds, lottery winnings, inheritance, judgments and any anticipated or

10

unexpected financial gains to the outstanding court-ordered financial obligation."  Thus, the conditions of supervised release provide additional assurances that defendant will continue to timely make restitution payments to the victims.  United States v. Sine, 2012 WL 1901298, *2 (E.D. Cal. 2012) (declining to terminate supervised release early "[b]ecause of the need for continued payment of restitution"); see also 18 U.S.C. § 3553(a)(7).  Defendant faces significant consequences if she fails to make regular restitution payments while on supervised release, or if she was found to hide assets or income that otherwise could be used to pay the victims back.  If her release was terminated, there would be no recourse in this criminal case.  (While victims may have some civil recourse against her, many reported that their efforts to recover their money from her before this criminal case were fruitless.)

Defendant argues that, even if she remains on supervised release, her monthly payments of $25 to the victims would amount to only a few hundred dollars during this period.  (Application at 12-13.)  But the current $25 payment schedule is not set in stone and could change if additional assets or income were discovered by the probation officer, or if defendant is able to increase her monthly income.  And even if her monthly payments remain nominal, it is nevertheless an important part of her own rehabilitation following her conviction that she continue to make payments (of whatever amount) to the victims who she defrauded.

**III. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's ex parte application for early termination of supervised release.

11